UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>ANDREW J. DOWD, M.D. AND TRIBOROUGH ORTHOPEDICS, P.C.,<br><br>Defendants. | C.A. No. _____ |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

I.     **INTRODUCTION**

1.      This case is about an orthopedic surgeon, Andrew J. Dowd, M.D. ("Dowd"), who has deliberately and systematically exploited automobile accident victims and the insurance coverage available to them under New York law by extracting No-Fault benefit payments from Allstate on his patients' behalf.

2.      As alleged herein, Dowd has unlawfully obtained significant sums of money from Allstate by submitting false and fraudulent claims seeking No-Fault benefit payments that Dowd was not eligible to seek or collect.

1

3.      The success of this scheme depended upon a steady stream of patients that Dowd could subject to unnecessary and unwarranted evaluations and surgical procedures.

4.      Throughout the course of this scheme, Dowd obtained the necessary patient base by working as a transient healthcare provider who treated patients at a series of clinics that catered almost exclusively to the treatment of alleged automobile accident victims.

5.      At each of these clinics, patients were steered to Dowd for orthopedic evaluations.

6.      The arrangements between Dowd and the clinics were advantageous to both parties because Dowd was given access to patients that he could evaluate and recommend for surgery, and because Dowd's evaluations always resulted in findings that other providers could use to support additional treatment and tests.

7.      Indeed, nearly all of the patients evaluated by Dowd were seen prematurely, usually at intervals that did not allow the patients' conditions to resolve on their own or even respond to conservative care.

8.      Evaluating the patients in this manner allowed Dowd to make unnecessary and unwarranted injury findings and recommendations for surgery.

9.      Dowd's evaluation of his patients in this manner helped him accomplish his goal of rushing patients to surgery before the patients' conditions had a chance to improve or resolve on their own.

10.     As detailed below, Dowd falsified the need for surgery, including arthroscopic surgeries of the knee and shoulder, by purposely basing his findings on conditions that were actually age-appropriate and degenerative (i.e., non-accident related) conditions rather than acute injuries that were caused or aggravated by the alleged automobile accidents.

11.    To maximize his profits from the performance of unnecessary and unwarranted surgeries, Dowd needed to falsely relate the patients' conditions to the underlying accidents in order to access the No-Fault insurance benefits and other coverages available to patients as a means of reimbursement for medical care.

12.    In other words, Dowd was unlikely to be paid for his services unless he could connect the patients' supposed conditions to the underlying accidents.

13.    For example, the majority of Dowd's patients underwent magnetic resonance imaging (MRI) that showed only degenerative conditions which, even if surgery was needed to address, would not be covered by the benefits available to patients through Allstate.

14.    Knowing this, Dowd purposely—and falsely—characterized the patients' MRI results as showing traumatic injuries and conditions, which could then be (wrongly) linked to the patients' underlying automobile accidents.

15.    Using these false findings, Dowd subjected the patients to unwarranted—and typically useless—invasive surgical procedures.

16.    Dowd then submitted, or caused the submission of, bills to Allstate seeking No-Fault reimbursement for these medically unnecessary and/or premature surgical procedures.

17.    To further inflate his charges to Allstate, Dowd also fraudulently billed for the surgeries in excess of the amounts permissible under the New York Workers' Compensation Fee Schedule.

18.    As detailed herein, Dowd also used these unwarranted—and relatively minor—surgical procedures to justify the prescription of unnecessary durable medical equipment ("DME") to his patients, items which were purportedly furnished to his patients through Defendant Triborough Orthopedics, P.C. ("Triborough Orthopedics"), a DME company owned by Dowd.

3

19.     Dowd's self-referrals of his surgery patients to Triborough Orthopedics for fulfillment of DME orders given by Dowd were unlawful because Dowd never properly disclosed—if at all—his financial relationships with and ownership interest in Triborough Orthopedics, as required by New York law.

20.     As a result of Dowd's unlawful self-referrals for DME provided through Triborough Orthopedics, Triborough Orthopedics was never eligible to seek or collect No-Fault benefit payments for the DME furnished to Dowd's patients.

21.     However, even if Dowd's deliberate self-referrals were not unlawful, the defendants were still not eligible to seek or collect No-Fault benefit payments for the DME purportedly provided by Triborough Orthopedics because the items were not medically necessary.

22.     Indeed, because the patients' surgeries were falsely justified in the first place, it follows that any services related to recovery were equally unjustified.

23.     Moreover, even if the patients' surgeries had been properly justified and warranted (they were not), the defendants' charges for DME—which consisted of continuous passive motion (CPM) devices and cold therapy units (CTU)—were still false and non-compensable because the DME devices were not effective and were not medically necessary.

24.     Indeed, Dowd ordered the DME for many of his surgical patients regardless of whether the patients actually expected or wanted the DME.

25.     As detailed herein, Dowd's deliberate orders and self-referrals for the DME were a necessary—and lucrative—aspect to the defendants' scheme to defraud Allstate, as the charges for the DME were another way in which Dowd was able to deplete—for his own personal benefit—the patients' available insurance coverage.

26.     Throughout the course of this scheme, Dowd, acting on his own and through Triborough Orthopedics, fraudulently enriched himself at the expense and risk of his patients, many of whom he subjected to invasive procedures that were (a) medically unnecessary, (b) premature, (c) not causally related to the underlying motor vehicle accident, (d) fraudulently charged, and (e) used as a basis to provide unnecessary and unwarranted DME to his patients.

27.     As detailed below, Dowd and Triborough Orthopedics never had any right to seek, collect, or retain No-Fault benefit payments in connection with any healthcare services purportedly provided to Allstate insureds.

28.     As a direct and proximate result of the defendants' unlawful conduct during the course of this scheme, Allstate was wrongfully induced to make No-Fault benefit payments totaling over $1,200,000.00 in connection with false and non-compensable claims submitted by (or on behalf of) Dowd and Triborough Orthopedics.

29.     Through this action, Allstate seeks to recover all monies wrongfully paid to Dowd and Triborough Orthopedics.

30.     Allstate's claim for compensatory damages includes: (a) payments made by Allstate to Dowd and Triborough Orthopedics in reliance upon the defendants' false representations that Dowd and Triborough Orthopedics were eligible to receive reimbursement under New York's No-Fault laws; (b) payments made by Allstate to Dowd and Triborough Orthopedics in reliance upon false medical documentation submitted (or caused to be submitted) by the defendants; (c) treble damages; (d) interest; (e) costs; and (f) attorney's fees.

31.     In addition to compensatory damages, Allstate seeks a declaration that it has no legal obligation to make any payments on any and all previously denied and/or currently unpaid claims submitted by (or on behalf of) Triborough Orthopedics because the DME was unwarranted

and unnecessary, and was the product of a self-referral from Dowd to Triborough Orthopedics in violation of New York Public Health Law § 238-d, which rendered Triborough Orthopedics ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

32.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

33.     The defendants purposely devised and executed this scheme with the express aim of obtaining payment of automobile insurance contract proceeds from Allstate even though Dowd and Triborough Orthopedics were not lawfully entitled to seek or receive such payments.

34.     In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their scheme to defraud.

35.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

36.     Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills for examinations, surgical procedures, and DME purportedly rendered and/or furnished to persons eligible for insurance coverage under Allstate insurance policies.

37.     By this Complaint, and as detailed in each count set out below, Allstate asserts claims against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; (c) unjust enrichment; and (d) declaratory relief.

II.     **THE PARTIES**

    A.     PLAINTIFFS

    38.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

    39.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

    40.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were each authorized to conduct business in New York.

    B.     DEFENDANTS

    41.     Dowd resides in and is a citizen of the State of New York.

    42.     At all relevant times, Dowd has been licensed to provide physician services in the State of New York.

    43.     At all relevant times, Dowd was the sole officer, director, and shareholder of Triborough Orthopedics.

    44.     Dowd participated in this scheme by evaluating automobile accident victims and then, in many instances, recommending that these patients undergo surgical procedures that were unnecessary and unwarranted.

7

45.     When Dowd provided healthcare services to patients, the patients were caused to enter into assignment of benefit agreements with Dowd, thus giving Dowd the right to seek payments directly from insurers pursuant to New York's No-Fault laws.

46.     As an assignee of his patients' benefits, Dowd sought and collected No-Fault benefit payments directly from insurers, including Allstate.

47.     As alleged herein, Dowd subjected patients to evaluations and surgical procedures that were (a) medically unnecessary, (b) premature, (c) not causally related to the underlying motor vehicle accident, and/or (d) falsely billed.

48.     Accordingly, throughout the course of this scheme, Dowd (and/or persons working under Dowd's direction) purposely sought No-Fault benefit payments from Allstate knowing that Dowd was not lawfully eligible to seek or collect such payments.

49.     After performing the unnecessary and unwarranted surgical procedures, Dowd further participated in this scheme by purposely ordering DME that was to be provided to patients through Triborough Orthopedics.

50.     Triborough Orthopedics is a New York professional service corporation with a principal place of business at 135-11 40th Road, Suite 7C, Flushing, New York 11354.

51.     When Triborough Orthopedics purportedly furnished DME to Dowd's patients, the patients were caused to enter into assignment of benefits agreements with Triborough Orthopedics, thus giving Triborough Orthopedics the right to seek payments directly from insurers pursuant to New York's No-Fault laws.

52.     As an assignee of its patients' benefits, Triborough Orthopedics sought and collected No-Fault benefit payments directly from insurers, including Allstate.

53.     As alleged herein, Triborough Orthopedics furnished, or was caused to furnish, DME to Dowd's patients, which DME was (a) medically unnecessary, (b) fraudulently charged, and (c) provided to patients in connection with an unlawful self-referral in violation of New York Public Health Law § 238-d.

54.     Accordingly, as alleged herein, Triborough Orthopedics (and/or persons working on behalf of Triborough Orthopedics, including, but not limited to, Dowd) purposely caused Triborough Orthopedics to seek No-Fault benefit payments from Allstate knowing that Triborough Orthopedics was not lawfully eligible to seek or collect such payments.

## III.   JURISDICTION AND VENUE

55.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

56.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

57.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

58.     At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws (as detailed *infra*).

59.     The defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

60.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent and non-compensable demands for payment under New York's No-Fault

laws, a substantial relationship exists between the transactions at issue and Allstate's causes of action.

## IV.   APPLICABLE LAWS AND REGULATIONS

### A.   NEW YORK'S NO-FAULT LAWS

61.   Allstate underwrites motor vehicle insurance in the State of New York.

62.   New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary professional healthcare services.

63.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, the "No-Fault" laws), motor vehicle insurers are required to provide coverage to persons involved in motor vehicle accidents, regardless of fault. These benefits are known as "No-Fault" benefits.

64.   New York law mandates that No-Fault benefit coverage in the amount of $50,000.00 to be available to each eligible claimant.

65.   Each eligible insured person (i.e., "claimant") may use such No-Fault benefits as a source of compensation for any "basic economic loss" incurred as the result of a motor vehicle accident.

66.   Under New York's No-Fault laws, "basic economic loss" is defined to include "all necessary expenses" for an array of professional healthcare services, including the evaluations, surgical procedures, and DME purportedly provided by the defendants. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

67.     Additionally, "[a]n insurer shall be liable only for the payment of benefits for losses caused by the accident, including those caused by the aggravation of preexisting conditions." 11 N.Y.C.R.R. § 65-3.14(a).

68.     A claimant may assign their No-Fault benefits to third parties, such as professional healthcare service providers.

69.     Pursuant to a duly executed assignment of benefits, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered, using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

70.     Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

71.     The NF-3 and CMS-1500 forms are important documents in the insurance industry. These certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

72.     Pursuant to New York Insurance Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime[.]"

73.     It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services that: (a) are never provided, (b) are billed as

11

expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided, or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

74.     Additionally, under New York law, a provider of healthcare services is not eligible for No-Fault reimbursement if the provider fails to meet *any* applicable New York state or local licensing requirement necessary to perform such service in New York, **or** if the provider fails to meet *any* licensing requirement necessary to perform the service in any other state in which the service is performed. 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

75.     Accordingly, if a professional healthcare service provider fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

## B.     NEW YORK WORKERS' COMPENSATION FEE SCHEDULE

76.     To regulate and control the fees charged by healthcare providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" (hereinafter, the "Fee Schedule").

77.     Both healthcare providers and insurers consult the Fee Schedule to determine the level of reimbursement payable on legitimate No-Fault benefit claims.

78.     The purpose of the Fee Schedule is to: (a) provide comprehensive billing guidelines in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by healthcare service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

79.     Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "[a]ll necessary expenses incurred for…professional health services," "subject to the limitations of" Insurance Law § 5108.

80.     Insurance Law § 5108 provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating" the provisions of the New York No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services specified in" Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

81.     Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedules prepared and established by the chairman of the workers' compensation board." *See also* 11 N.Y.C.R.R. § 65-3.16(a)(1) ("Payment for medical expenses shall be in accordance with fee schedules promulgated under section 5108 of the Insurance Law…").

C.     NEW YORK LAW REGARDING SELF-REFERRALS

82.     When a healthcare provider refers a patient to another provider or facility in which the referring provider has a financial relationship, such a referral creates the risk of unnecessary services because the provider's own financial motivations might be placed ahead of the actual needs of the patient, thereby raising healthcare costs and subjecting patients to unnecessary care.

83.     To control the risks posed by such self-referrals, New York Public Health Law § 238-a prohibits certain healthcare service providers from referring patients to another healthcare service provider (or to an immediate family member of the provider) for certain services (namely,

clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services, or x-ray or imaging services) where a financial relationship exists between the providers.

84.    "Financial relationship" is defined by the statute as "an ownership interest, investment interest or compensation arrangement." *See* N.Y. Pub. Health Law § 238(3); 10 N.Y.C.R.R. § 34-1.2; *see also* N.Y. Pub. Health Law § 238-a(3) (defining ownership interest or investment interest).

85.    New York Public Health Law § 238-d pertains to practitioner disclosure requirements for certain referrals that are not prohibited by, or subject to an exception under, section 238-a. *See also* 10 N.Y.C.R.R. § 34-1.5(a).

86.    Section 238-d(1)(a) prohibits a practitioner from making "a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has…an ownership or investment interest…with such health care provider" without disclosing the financial relationship to the patient. *See also* 10 N.Y.C.R.R. § 34-1.5(a)(1).

87.    Section 238-d(2) requires that the disclosure "provide notice of any such financial relationship and shall also inform the patient of his or her right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available." *See also* 10 N.Y.C.R.R. § 34-1.5(b).

88.    The applicable regulations prescribe the form that the disclosure must take and also require that the disclosure "be posted prominently in the practitioner's office." *See* 10 N.Y.C.R.R. § 34-1.5(b); 10 N.Y.C.R.R. § 34-1.6.

89.    Accordingly, if a referral is subject to section 238-d and the disclosure requirement is not met, then the referral is unlawful and the provider is prohibited from collecting No-Fault

benefit payments in connection with any services or products provided based on the improper referral.

## V.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

90.     New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of professional healthcare services, and is also designed to require prompt payment of patient claims.

91.     As a result, the submission of facially valid bills by healthcare providers for patient services will often result in prompt payment from a No-Fault insurer.

92.     However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive payment under Insurance Law § 5102 if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

93.     As explained below, at all relevant times, Dowd has taken advantage of New York's No-Fault system by rapidly recommending that his patients undergo surgery—often for conditions that were not causally related to the underlying motor vehicle accident.

94.     These procedures were premature and medically unnecessary because, among other things, Dowd rushed the patients into surgery before the patients' conditions had enough time to respond to conservative care (which they were supposedly receiving) or simply resolve on their own.

95.     In addition to defrauding Allstate, Dowd jeopardized his patients' health by subjecting them to surgeries that they did not need, procedures which further jeopardized his patients' health, safety, and well-being by exposing them to unnecessary general anesthesia and to the accompanying risks of infection or grave cardiovascular events.

96.     As explained below, Dowd's evaluations and surgeries were not meant to address or improve his patients' conditions; instead, Dowd purposely provided these services to maximize his own profits, and to justify the provision of additional (and excessive) physical therapy, chiropractic, and acupuncture treatment to Dowd's patients at various healthcare clinics whose provider(s) referred patients to Dowd.

97.     As a result, Dowd is not—and never was—eligible for reimbursement for these procedures under New York's No-Fault laws.

98.     At all relevant times, Dowd knew that the bills submitted to Allstate were not compensable under New York's No-Fault laws because the procedures performed by him were (a) not causally related to the underlying motor vehicle accident; (b) premature; (c) medically unnecessary; and/or (d) falsely charged.

99.     What is more, Dowd furthered this scheme by ordering DME for his surgery patients, with the intent of having Triborough Orthopedics provide (and bill for) the DME regardless of whether the patients even needed the equipment.

100.    The DME devices purportedly dispensed to patients by Triborough Orthopedics were unnecessary for patient care, and were merely a vehicle to further enrich Dowd.

101.    Further, the defendants, at all relevant times, knew that the bills submitted to Allstate by Triborough Orthopedics were non-compensable under New York's No-Fault laws as a result of Dowd's self-referral of DME prescriptions to Triborough Orthopedics (which he owned) without making proper disclosures to patients of Dowd's ownership interest in Triborough Orthopedics.

102.    As a result, even if the DME devices were necessary (which they were not because Dowd required and/or ordered DME for all of his surgery patients regardless of clinical need),

Triborough Orthopedics is not—and never was—eligible for reimbursement where the devices were provided based upon Dowd's unlawful self-referral.

103.    At all relevant times, the defendants knew that the bills submitted to Allstate seeking reimbursement for DME prescribed by Dowd were not compensable under New York's No-Fault laws because the DME devices were (a) medically unnecessary, (b) furnished without proper disclosure to the patient of Dowd's ownership interest in Triborough Orthopedics, and/or (c) accompanied by excessive charges.

A.    **DOWD'S FRAUDULENT AND IMPROPER TREATMENT OF ALLSTATE INSUREDS**

1.    *Patient Referrals and Intentional Misrepresentations Concerning Place of Service*

104.    Dowd's scheme to defraud Allstate is reliant upon his having a steady stream of patients with available No-Fault benefits for Dowd to exploit through the performance of, and billing for, medically unnecessary and/or premature surgical procedures and patient consultations and/or examinations that were not rendered as represented.

105.    Many of the bills submitted by Dowd to Allstate falsely represent that the patient consultations and examinations take place at 3771 Nesconset Highway, Suite 102A, South Setauket, New York, or 3771 Nesconset Highway, Suite 213, South Setauket, New York, even though Dowd, upon information and belief, did not exclusively treat patients at these locations during the relevant treatment period.

106.    Rather, to facilitate his scheme and ensure his access to automobile accident victims, Dowd actually operated as a transient provider who saw patients at a number of multi-disciplinary clinics that predominantly treat No-Fault patients.

107.    These locations include, but are not necessarily limited to, the following:

- 1975 Linden Boulevard, Elmont, NY

17

- 135-25F 79th Street, Howard Beach, NY
- 71 South Central Avenue, Suite 101, Valley Stream, NY
- 318 Seguine Avenue, Staten Island, NY
- 951 Brook Avenue, Bronx, NY
- 95 Clinton Street, Hempstead, NY
- 390 Fulton Avenue, Hempstead, NY
- 474 Fulton Avenue, Hempstead, NY
- 2426 Eastchester Road, Bronx, NY
- 615 Seneca Avenue, Ridgewood, NY
- 84 Linden Boulevard, Brooklyn, NY
- 148-43 Hillside Avenue, Jamaica, NY
- 410 East 189th Street, Bronx, NY
- 2 Wilson Place, Third Floor, Mt. Vernon, NY
- 4226 Third Avenue, Suite 1, Bronx, NY
- 2184 Flatbush Avenue, First Floor, Brooklyn, NY

108.    Upon information and belief, Dowd makes payments in the form of "rent" to one or more of the providers operating from these locations in exchange for patient referrals.

109.    Moreover, Dowd's purported office locations in South Setauket, New York are between approximately forty (40) and eighty (80) miles away from the clinics whose providers referred patients to Dowd thus making it highly unlikely that the patients actually traveled an hour or more to be examined by Dowd.

110.    Indeed, several Allstate claimants have denied visiting or being treated at a facility on Nesconset Highway in South Setauket, New York.

111.    For instance, Dowd submitted an examination report and bill to Allstate for a new patient evaluation of Allstate claimant A.L. (claim no. 0470956764) purportedly taking place on September 15, 2017.

112.    Both the HCFA-1500 form and the report letterhead submitted by Dowd to Allstate regarding the September 15, 2017 examination identify the service facility location as 3771 Nesconset Highway, South Setauket, New York.

18

113.    However, A.L. testified that she did not know where the South Setauket, New York location was and that, rather, she met with an orthopedist at the facility located at 390 Fulton Avenue, Hempstead, New York where she was receiving physical therapy, acupuncture, and chiropractic treatment.

114.    Similarly, Dowd submitted an examination report and bill to Allstate seeking reimbursement for a new patient evaluation for Allstate claimant D.M. (claim no. 0490026069) that purportedly occurred on April 5, 2018.

115.    The HCFA-1500 form and examination report submitted to Allstate by Dowd regarding the April 5, 2018 examination both identify the service facility location as 3771 Nesconset Highway, South Setauket, New York.

116.    However, D.M. testified that the South Setauket, New York location did not sound familiar and that she had not been to any other facility for treatment other than the MRI facility and the therapy facility located at 4226 Third Avenue, Suite 1, Bronx, New York where D.M. received physical therapy, acupuncture, and chiropractic treatment.

117.    Likewise, Dowd submitted to Allstate a HCFA-1500 and examination report regarding a February 2, 2018 examination of Allstate claimant M.M. (claim no. 0487629594), which both identified the service facility location as 3771 Nesconset Highway, South Setauket, New York.

118.    However, M.M. testified that she had never been to a facility on Nesconset Highway in South Setauket in connection with the accident.

119.    During the time period of February 2018, M.M. received physical therapy, acupuncture, and chiropractic treatment at a facility located at 318 Seguine Avenue, Staten Island, New York.

120.     Therefore, it is clear that Dowd misrepresented the location of treatment on HCFA-1500 forms submitted to Allstate during the relevant treatment period when, in actuality, he treated patients at a variety of locations that afforded Dowd access to patients with available No-Fault benefits.

### 2.     Dowd's Participation in a Criminal Scheme Involving Surgeries for Fictitious and Fabricated Injuries

121.     On April 17, 2018, an individual named Peter Kalkanis ("Kalkanis") was indicted on mail fraud charges in connection with a widespread scheme to defraud insurance carriers and others. *See United States v. Kalkanis*, No. 1:18-cr-00289-LTS (S.D.N.Y.) (hereinafter "Kalkanis Criminal Matter").

122.     According to the indictment, for several years up through April 2018, Kalkanis and several co-conspirators defrauded insurance carriers and others by staging accidents and then filing fraudulent lawsuits arising from these staged accidents.

123.     The scheme was led by Kalkanis, a former chiropractor, who was alleged to be the organizer and leader of the criminal enterprise.

124.     As the leader, Kalkanis was alleged to have (a) recruited participants into the scheme, and (b) worked with these participants—persons known colloquially as "runners"—to recruit patients for the scheme.

125.     Kalkanis allegedly (a) organized the patients' medical and legal appointments, (b) worked with the runners to facilitate the transportation of patients to-and-from their medical and legal appointments, and (c) helped in procuring funding for the patients' medical treatment and lawsuits.

126.    According to the indictment, Kalkanis and his cohorts conspired to have the patients stage an accident and claim injuries caused by the "accident," or, in some cases, claim injuries from "accidents" that never even happened.

127.    In all cases, Kalkanis and the others worked to ensure that the patients reported their injuries, and then sought medical treatment—including surgeries—for supposed knee, shoulder, and/or back injuries.

128.    The treatment allegedly involved (a) treatment with a chiropractor for the purpose of generating medical records to support the patients' claims, and (b) referrals to an MRI facility for diagnostic imaging, which, upon information and belief, generated findings that were utilized to support additional treatments.

129.    The treatment also involved surgeries, which the patients were allegedly instructed to undergo as a prerequisite for bringing a lawsuit based on their supposed injuries.

130.    According to the indictment, when patients were reluctant to undergo surgery (which, in some cases, was to be performed when the patients were not even injured), the patients were induced to undergo these unnecessary surgeries in exchange for a post-surgery cash payment plus a percentage of whatever money was obtained through settlement of patients' lawsuits.

131.    At or around the time that the patients were undergoing medical treatment, Kalkanis and the others also worked together to bring the patients to an attorney for the purpose of bringing a lawsuit against an insurance company or other responsible party.

132.    According to the indictment, these lawsuits were fraudulent because they never disclosed that the alleged "accidents" were deliberately caused or that the "accidents" had never actually happened at all.

133.    These lawsuits were also alleged to be fraudulent because the allegations always claimed that the "accidents" were the sole cause of the patients' injuries.

134.    Although the Kalkanis Criminal Matter was only brought against Kalkanis and the "runners" that he worked with, the scheme involved several other participants, including the medical providers who rendered treatments to and performed surgeries on patients who were not injured legitimately, or never injured at all.

135.    After the indictment was unsealed, Kalkanis was arrested and then released on bond. As a condition of this release, Kalkanis was specifically prohibited from having any contact with Andrew Dowd—i.e., the same Andrew Dowd named in this matter.

136.    Kalkanis was also prohibited from contacting several individuals such as lawsuit funders, lawyers, and other medical providers, and was also barred from engaging in any further conduct related to personal injury lawsuits.

137.    On or about April 8, 2019, Kalkanis appeared for a change of plea hearing, and pleaded guilty to all charges in the indictment, including mail fraud, wire fraud, and conspiracy to conduct the same.

138.    During the change of plea hearing, Kalkanis admitted that he and others defrauded insurance carriers and other companies by seeking and obtaining payment in connection with the staged accidents and bogus injuries—payments that were typically obtained through lawsuits predicated on (a) the patients' injuries, (b) the findings and costs arising from the patients' medical treatment, and (c) the nature and extent of the patients' supposed pain and suffering.

139.    Kalkanis further admitted that he voluntarily participated in the scheme with the intent to enrich himself, and with the knowledge that he and his cohorts' conduct was "morally wrong and illegal."

140.    Kalkanis concluded the proceeding by acknowledging deep involvement in the scheme from the start to the finish, and by admitting that patients actually underwent unnecessary surgeries as part of this scheme.

141.    On May 16, 2019, Kalkanis was called to testify at the trial of his co-conspirators during which Kalkanis provided additional specific details about all aspects of the scheme, including the involvement of medical providers in providing treatments to the patients involved in the scheme.

142.    Kalkanis testified that Dowd, an orthopedic surgeon, was one of the medical providers involved in the scheme, and that Dowd performed surgeries on patients who had staged or faked their injuries.  *See* Transcript of Proceedings in *United States v. Duncan, et al.*, No. 18-cr-00289 (S.D.N.Y.) at p. 1043 (hereinafter, "Tr. at p.___"), attached hereto as Exhibit 1.

143.    Kalkanis also testified how Dowd utilized Triborough Orthopedics as part of the scheme. According to Kalkanis, Dowd owned Triborough Orthopedics, and every patient that underwent surgery with Dowd was required to lease equipment from Triborough Orthopedics following surgery. *See* Tr. at p. 1064 (explaining that "Triborough [Orthopedics] is a company that's owned by Dr. Dowd, the orthopedic surgeon in our crew.").

144.    Kalkanis then explained that he used Dowd as part of the scheme because Dowd was amenable to lowering his surgical fees in exchange for additional patient referrals. *Id.* at p. 1065.

145.    Kalkanis also explained that Dowd was a necessary and valuable contribution to the scheme because Dowd was a "personal injury" physician who wrote reports and who "knew what [he was] doing, meaning that [he] added value to each case." *Id.* at p. 1065.

23

146.   Kalkanis also disclosed how Dowd knew that many of the accidents were staged because Kalkanis directly told Dowd that the accidents were staged. *Id.* at pp. 1065-1066.

147.   The jury ultimately found Kalkanis' confederates guilty of mail fraud, wire fraud, and conspiracy to commit the same.

148.   While the Kalkanis Criminal Matter involved slip-and-fall accidents, the mechanics of the scheme as admitted to and explained by Kalkanis—including Dowd's and Triborough Orthopedics' participation therein—help illustrate the defendants' overall motive, opportunity, intent, plan, and knowledge with respect to the scheme alleged herein.

### 3.   *Treatment Protocol for Dowd's Patients*

149.   In large part, this scheme was driven by Dowd's close relationship with several clinics that were dedicated to treating automobile accident patients.

150.   Patients treating at these clinics were almost always subjected to the same (or similar) pre-determined protocol of treatment, which involved extensive—and concurrently provided—chiropractic, physical therapy, and acupuncture treatment.

151.   Prior to seeing Dowd, the patients' treatment generally proceeded in a remarkably similar, yet always medically unnecessary, fashion.

152.   First, immediately following the accident, the patients sought out (or were referred or steered to by others) one of the multi-disciplinary clinics, which were virtually always structured to specialize in the treatment of automobile accident injuries and the acceptance of No-Fault insurance benefits.

153.   The patients' initial visit to one of these clinics usually involved the execution of insurance paperwork (including an assignment of No-Fault benefits in favor of each provider

associated with the clinics), followed by an initial evaluation by whichever healthcare provider happened to be available.

154.    Typically conducted by a physician or chiropractor, the initial evaluations usually involved a cursory examination after which the patients were diagnosed with a wide array of conditions (e.g., soft tissue sprains, strains, contusions, etc.), placed on a protocol of treatment with the providers operating at the clinic, and referred for diagnostic testing and further evaluations with other providers, such as Dowd.

155.    Before the patients reach Dowd, they are usually referred for MRI studies during the course of their treatment at this clinic—referrals which are, in many cases, inappropriate given the close proximity to the start of patient care.

156.    Indeed, the MRI studies are often ordered without typical "red flag" indicators to support their use.

157.    The MRI studies were important to the providers operating at these clinics and to Dowd because the findings derived from the interpretation of the studies can provide a basis to continue treatment of a patient.

158.    For example, findings of acute trauma and injuries can be used to justify the delivery of additional care and can also support a conclusion that the injuries are accident-related, while findings of non-traumatic injuries and other pre-existing conditions will not support such continued treatments and conclusions as to causation.

159.    Notably, however, in the case of patients treated by Dowd, the injuries and conditions shown by the MRI studies, if any, were almost always age-appropriate and degenerative with no signs of true traumatic pathology, but the accompanying reports frequently were drafted

using terminology suggestive of traumatic etiology, which results in the patients' conditions being misrepresented.

160.    Using the misrepresented MRI results as support, the patients were subjected to unnecessary treatments by Dowd and other providers for injuries that did not exist and/or for injuries that simply were not accident-related.

### 4.    *Dowd's Performance of Premature and Medically Unnecessary Surgical Procedures*

161.    Dowd's initial patient evaluations were deliberately designed to support the need for arthroscopic surgery, and were often performed before the patients' limited soft-tissue injuries ever had a chance to resolve.

162.    To create a false basis for his surgical recommendations, Dowd often diagnosed patients with injuries that would not be expected to be caused by an automobile accident.

163.    For instance, Dowd routinely diagnosed patients with impingements or meniscal tears even though automobile accidents are unlikely to cause these conditions, especially in the frequency found by Dowd.

164.    Indeed, tears of the meniscus (which is a portion of knee cartilage) also commonly occur in middle-aged and older patients who do not have a history of trauma or even prior complaints of knee pain.

165.    Thus, meniscus tears are common and, in the case of Dowd's patients, are unlikely to be accident-related and thus eligible for No-Fault coverage.

166.    Throughout the course of this scheme, Dowd purposely used the patients' MRI studies to support the need for surgery even though the MRIs contained degenerative, non-traumatic conditions that were not causally related to the patients' alleged accident.

167.    Using these false and/or misrepresented findings, Dowd performed relatively minor arthroscopic surgeries for conditions that were not accident-related or that, in some cases, did not even exist.

168.    Even in cases where the patients might have had an accident-related injury, Dowd's surgeries were still unnecessary and unwarranted because Dowd's recommendations were given and surgeries were performed before the patients had sufficient time to heal on their own.

169.    Indeed, the self-limiting sprains and strains purportedly suffered by the patients usually resolve within four (4) to twelve (12) weeks depending on severity, and the contusions suffered by the patients usually resolve on their own within a matter of days or weeks.

170.    Additionally, Dowd also rushed patients to surgery using the false justification that the patients' conditions warrant immediate surgical intervention.

171.    Dowd's justifications are false, however, because virtually none of Dowd's surgery patients had conditions that would justify urgent surgical care, such as a full-thickness rotator cuff tear or a locked knee (i.e., inability to fully extend the knee).

172.    Even if Dowd's findings were not misrepresented and even if the patients actually needed surgery, Dowd's treatment was still fraudulent and unnecessary.

173.    For example, Dowd typically performed a simple debridement of the allegedly injured area during the surgeries even though the involved area only had degenerative, not acute, pathology.

174.    In these cases, Dowd purposely provided unnecessary and unwarranted services because arthroscopic knee surgery is not recommended for patients with degenerative knee disease.

175.    Indeed, most patients suffering from only degenerative (i.e., not accident-related) injuries will experience an improvement in pain and function without arthroscopy.

176.    Overall, Dowd's patients did not need surgery and for the select few that were actually injured as a result of the accident, they could have managed their conditions without the surgery.

177.    Rather, Dowd subjected these patients to unnecessary and premature invasive procedures that placed his patients at risk of complications and infection.

178.    For all of these reasons, Dowd's performance of unnecessary surgeries and his flimsy attempts to tie the patients' diagnoses to the underlying motor vehicle accident only served to line his own pockets and to justify continued treatment by other providers with whom Dowd maintained referral relationships.

179.    Accordingly, the surgical procedures, including, but not limited to, arthroscopic surgery of the knee, shoulder, and wrist performed by Dowd to Allstate claimants were unjustified, and each charge submitted to Allstate by Dowd for these services is not compensable under New York's No-Fault laws, including, but not limited to, the services listed in Exhibit 2.

180.    To the extent that Allstate paid Dowd in reliance on the documents created and submitted to Allstate by Dowd in connection with any surgical procedures provided to Dowd's patients, Allstate is entitled to recover all payments made to Dowd in connection with any such procedures, including, but not limited to, those payments listed in Exhibit 3.

181.    Additionally, to the extent that any of Dowd's charges submitted in connection with surgical procedures remain unpaid (including, but not limited to, the services listed in Exhibit 2), Allstate is under no obligation to make any payments in connection with those transactions because those services were medically unnecessary, premature, and/or not causally related to the

underlying motor vehicle accident, and therefore not compensable under New York's No-Fault law.

### 5. *Specific Examples of Medically Unnecessary Surgeries Performed by Dowd*

182.    The following claims exemplify Dowd's pattern of performing premature and/or medically unnecessary surgical procedures for Allstate claimants.

#### a.    L.B. (claim no. 0392815700)

183.    Claimant L.B. was an eighty-four (84) year old man who purportedly was involved in a motor vehicle accident on November 13, 2015.

184.    Just days later, L.B. began treating at a clinic located at 2184 Flatbush Avenue, Brooklyn, New York.

185.    After a brief initial examination, in which there were no complaints about the extremities or of radiating pain, L.B. was started on chiropractic and acupuncture treatment during the clinic visit and orders were made for MRI studies of L.B.'s cervical and lumbar spine.

186.    L.B. was evaluated by a physiatrist at the clinic the next day, and after a cursory examination was sent for MRI studies of the left shoulder and right knee despite limited evidence of injury to these areas. L.B. was also referred for cervical and lumbar spine MRI studies despite receiving the same orders from a different provider at the clinic the day prior.

187.    Overall, L.B.'s injuries (if any) consisted only of sprains, strains, and contusions, conditions that were self-limited and capable of resolving on their own in about four (4) to (six) weeks with a short course of physical therapy or chiropractic care.

188.    Despite these limited injuries, L.B. was referred for and underwent MRI studies shortly after the start of treatment, even though there were no "red flag" indicators present to justify immediate MRI studies for this patient.

189.    L.B.'s right knee MRI showed severe arthritis, cartilage loss, and other chronic conditions, all of which are degenerative conditions and certainly not the result of injuries supposedly sustained in a recent accident.

190.    Then, just six (6) weeks after the accident, L.B. was evaluated by Dowd and diagnosed with internal derangement in the right knee and then scheduled by Dowd for surgery.

191.    Dowd's report of L.B.'s orthopedic surgery evaluation purposely excludes any mention of the various degenerative conditions found during the MRI study of L.B.'s right knee. Dowd's report of his surgery recommendation also deliberately excludes the fact that L.B. was still in the early stages of treatment.

192.    About two (2) weeks after Dowd's only evaluation of L.B., Dowd performed a surgery on L.B.'s right knee.

193.    During surgery, Dowd found and repaired the degenerative tears to L.B.'s meniscus, tears which were not acute, recent, or plausibly related to L.B.'s November 13, 2015 accident.

194.    Because L.B.'s injuries (if any) were degenerative and not accident related, then the services are not covered under No-Fault.

195.    Even if L.B.'s supposed knee injuries were accident related, the surgery was still unnecessary and not compensable under No-Fault because there is no clinical support establishing the efficacy of arthroscopic knee surgery for meniscal tears in older patients such as L.B.

196.    Because Dowd purposely misrepresented L.B.'s condition, and then recommended and performed surgery that was medically unnecessary and falsely justified, Dowd is not lawfully eligible to seek payment from Allstate in connection with these services.

197.   To the extent that Allstate paid Dowd in reliance on the documents created and submitted by Dowd to support the charges in connection with L.B.'s surgery, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, the payments listed in Exhibit 3.

198.   To the extent that any of the charges submitted by Dowd in connection with the services provided to L.B. remain unpaid, Allstate has no further obligation to make payment in connection with these services because Dowd's charges are not compensable under New York's No-Fault laws.

b.     E.E. (claim no. 0387317456)

199.   Claimant E.E. purportedly was involved in a motor vehicle accident on October 11, 2015.

200.   E.E. was found to have suffered strains and sprains as a result of the accident, which are soft-tissue injuries that are expected to resolve within four (4) to six (6) weeks.

201.   About three (3) days later, E.E. began treating at the clinic located at 2184 Flatbush Avenue, Brooklyn, New York.

202.   E.E. received a chiropractic evaluation on his first visit. E.E. was also given an acupuncture evaluation during the same visit.

203.   E.E. was also ordered to undergo MRI studies.

204.   E.E. was then evaluated by a physiatrist at the same clinic who diagnosed several injuries and then ordered MRI studies of E.E.'s spine, shoulder, hip, and knee.

205.   Notably, E.E. never made complaints of pain in the knee, hip, or shoulder prior to seeing the physiatrist.

206.     Indeed, neither the emergency room records nor the initial chiropractic records document any injuries to either of E.E.'s shoulders or knee.

207.     The MRI studies were ordered three (3) to eleven (11) days after the accident despite the lack of any "red flag" indicators suggesting the need for diagnostic imaging.

208.     The MRI studies showed only degenerative conditions in E.E.'s shoulders.

209.     Dowd then evaluated E.E. on November 12, 2015, which was about one (1) month after the accident.

210.     Dowd recommended surgery to E.E.'s shoulder based on findings of impingement and other degenerative conditions that were not related to the accident and were not typically managed with surgery.

211.     Dowd then rushed E.E. into surgery about a week later, which was less than six (6) weeks after the accident.

212.     Dowd reported diffuse labral fraying, synovitis, and partial tearing of the rotator cuff, which Dowd debrided; however, the pathology encountered and described by Dowd, labral pathology and partial thickness rotator cuff tear pathology, are not the product of accident-related trauma, and thus the procedure was not eligible for coverage under New York's No-Fault law.

213.     In this case, Dowd purposely mischaracterized the nature and severity of E.E.'s alleged post-accident condition to falsely justify his aggressive recommendations for and provision of surgery.

214.     Because the surgery was not medically necessary and not warranted at all, Dowd had no legal right to seek or collect No-Fault benefit payments in connection with E.E.'s left shoulder surgery.

215.     To the extent that Allstate paid Dowd in reliance on the documents created and submitted by Dowd to support the charges in connection with E.E.'s surgery, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, the payments listed in Exhibit 3.

216.     To the extent that any of the charges submitted by Dowd in connection with the services provided to E.E. remain unpaid, Allstate has no further obligation to make payment in connection with these services because Dowd's charges are not compensable under New York's No-Fault laws.

c.     F.V. (claim no. 0388412538)

217.     Claimant F.V. purportedly was involved in a motor vehicle accident on October 16, 2015.

218.     F.V. was evaluated by a physician two (2) days later who diagnosed F.V. with numerous sprains and strains.

219.     The physician also administered an unspecified injection to F.V. and then ordered a battery of imaging studies of the back, shoulders, and knees.

220.     F.V. started chiropractic care the next day with a chiropractor that operated from a clinic in Valley Stream, New York.

221.     The chiropractor diagnosed F.V. with spinal sprains, strains, and pain, but did not make any findings concerning F.V.'s knees or shoulders.

222.     The chiropractor ordered daily treatments for four (4) weeks along with MRI studies and other diagnostic testing.

223.     F.V. was evaluated a few days later by another physician that also worked from the same Valley Stream clinic.

224.    The physician made numerous findings and ordered physical therapy and additional MRI studies.

225.    F.V. started physical therapy the next day with a provider who also worked at the Valley Stream clinic.

226.    F.V. also underwent acupuncture at the same clinic during the same period.

227.    F.V. then underwent MRI studies for the cervical and lumbar spine, the right and left shoulder, and the right knee during three (3) separate sessions between November 10, 2015 and November 27, 2015.

228.    F.V. was evaluated by a physician who reviewed the reports of F.V.'s MRI studies, and then recommended additional care, including orthopedic and neurology consultations.

229.    On December 9, 2015, F.V. was examined by Dowd at which visit Dowd diagnosed F.V. with "[i]nternal derangement of left shoulder with a multitude of symptoms unresponsive to conservative care with MRI findings of intraarticular pathology" as well as right shoulder impingement syndrome. Dowd then scheduled a diagnostic arthroscopy of the left shoulder.

230.    Dowd debrided the rotator cuff, labrum, and synovium, but did not make any actual repairs to the rotator cuff or labrum as none were necessary.

231.    The operative report for F.V.'s procedure illustrates clearly the unnecessary nature of the surgical procedure as the operation did not find or address any accident-related post-traumatic pathology.

232.    For example, the MRI study purportedly showed a condition in the anteroinferior labrum, but the surgery focused on the superior labrum, which is in a different area.

233.    Additionally, the damage that was supposedly found during the operation was not even related to F.V.'s accident as superior labral pathology and impingement are most often not the result of acute trauma.

234.    However, even if F.V.'s supposed left shoulder injuries were caused by the subject accident, the surgery was still unnecessary because F.V.'s supposed conditions were better addressed through a full course of conservative care rather than invasive surgery.

235.    Dowd rushed F.V. to surgery so shortly after the accident that F.V. had no opportunity to address the left shoulder in an appropriate manner.

236.    The baseless nature of the surgery is also illustrated by the fact that Dowd found nothing to repair and instead focused his limited effort on non-accident-related conditions.

237.    In this case, Dowd purposely mischaracterized the condition of F.V.'s left shoulder to falsely support his aggressive—and grossly unwarranted—recommendations for and provision of surgery.

238.    Because the surgery was not medically necessary and not warranted at all, Dowd had no legal right to seek and collect No-Fault benefits payments in connection with F.V.'s left shoulder surgery.

239.    To the extent that Allstate paid Dowd in reliance on the documents created and submitted by Dowd to support the charges in connection with F.V.'s surgery, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, the payments listed in Exhibit 3.

240.    To the extent that any of the charges submitted by Dowd in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Dowd's charges are not compensable under New York's No-Fault laws.

d.      S.S. (claim no. 0428407050)

241.    Claimant S.S. purportedly was involved in a motor vehicle accident on September 11, 2016.

242.    S.S. was not treated at the accident scene, and also did not seek or require treatment at the emergency room following the accident.

243.    Instead, S.S. began treatment on the same day as the accident at a clinic located at 2 Wilson Place, Third Floor, Mount Vernon, New York.

244.    S.S. was evaluated by a physician at the clinic who diagnosed S.S. with sprains and strains of the neck and back, plus unspecified shoulder pain and stiffness.

245.    S.S. was ordered to undergo additional treatment and was referred for further neurological testing even though the initial neurologic exam was completely normal.

246.    S.S. then began physical therapy and chiropractic treatment from providers that operated from the clinic.

247.    Shortly after starting treatment, S.S. was examined by another physician who made findings similar to the first physician, but who also purposely described the injuries as being related to the subject accident.

248.    The physician also suggested MRI studies for S.S.'s cervical spine, lumbar spine, and right shoulder if pain did not improve with conservative treatment.

249.    Just days later, however, S.S. underwent MRI studies of the cervical spine, and later underwent MRI studies of the right shoulder and lumbar spine.

250.    The MRI study of S.S.'s right shoulder showed a mild strain of the deltoid muscle in addition to some tearing that was degenerative in nature.

251.     S.S. was then referred for an orthopedic evaluation, which was performed by Dowd on October 28, 2016.

252.     Dowd's examination revealed right shoulder pain that supposedly did not respond to therapy. The exact nature and extent of this therapy was not described by Dowd.

253.     Dowd also found pain and impingement, and further reported that the MRI study showed a large partial supraspinatus tear as well as a torn ligament.

254.     The nature of the supposed torn ligament is unclear, and the interpretive report of S.S.'s right shoulder MRI study does not contain any mention of such pathology.

255.     Dowd recommended diagnostic arthroscopy of the right shoulder even though S.S. had mostly age-appropriate degenerative conditions, and had not even had a chance to complete an initial course of conservative care.

256.     Dowd rushed S.S. into surgery about a week later.

257.     The baseless nature of the surgery is illustrated by the fact that Dowd found nothing to repair during the operation, and instead, focused his limited effort on conditions that were not accident related.

258.     Instead, the operation focused only on degenerative conditions that are actually best treated without surgery.

259.     In this case, Dowd purposely mischaracterized the condition of S.S.'s right shoulder to falsely support his aggressive—and grossly unwarranted—recommendations for, and provision of, surgery.

260.     Because the surgery was not medically necessary or warranted at all, Dowd had no legal right to seek or collect No-Fault benefits payments in connection with S.S.'s right shoulder surgery.

261.    To the extent that Allstate paid Dowd in reliance on the documents created and submitted by Dowd to support the charges in connection with S.S.'s surgery, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, the payments listed in Exhibit 3.

262.    To the extent that any of the charges submitted by Dowd in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Dowd's charges are not compensable under New York's No-Fault laws.

e.    M.M. (claim no. 0422019745)

263.    On July 18, 2016, claimant M.M. purportedly was involved in a low-speed motor vehicle accident with minor vehicular damage.

264.    M.M. presented at the hospital following the motor vehicle accident with complaints of mid-back pain, and was discharged that same day with instructions to use warm compresses and ibuprofen.

265.    On July 20, 2016, M.M. sought treatment at a clinic in Brooklyn, New York.

266.    M.M. received both a chiropractic evaluation and acupuncture evaluation on her first visit to the clinic.

267.    M.M. was prescribed chiropractic treatment for three (3) to four (4) months at a frequency of three (3) to four (4) times per week and acupuncture treatment two (2) to three (3) times per week.

268.    The following day, M.M. underwent an initial evaluation with a physician for complaints of neck pain, back pain, and left arm pain. M.M. was diagnosed with sprains and strains to the spine and shoulders and a soft tissue injury to the left arm.

269.    M.M. was instructed to begin physical therapy and to undergo an MRI of the right and left shoulders as well as x-rays of the spine and shoulders if symptoms did not improve with therapy.

270.    M.M. received a physical therapy evaluation on July 22, 2016 and was instructed to undergo physical therapy three (3) times per week for four (4) weeks.

271.    On August 8, 2016, M.M. underwent an MRI study of the right shoulder, which was unremarkable and revealed no tear of the labrum and rotator cuff. Overall, the study showed no post-traumatic abnormality.

272.    Indeed, M.M. was examined by an internist on August 21, 2016, which examination did not demonstrate swelling or bruising consistent with a right shoulder injury resulting from the motor vehicle accident.

273.    Additionally, on August 25, 2018, M.M. was examined by another physician who specifically noted that the MRI of the right shoulder was unremarkable.

274.    On September 17, 2016, M.M. underwent another MRI of the right shoulder. This time, the radiologist noted mild to moderate degenerative changes and associated diffuse partial tearing of the labrum. Again, no post-traumatic findings were identified.

275.    On October 13, 2016, Dowd evaluated M.M. and noted that M.M. reported shoulder pain with minimal change with physical therapy; however, Dowd did not describe the extent of this therapy or any other conservative care.

276.    Moreover, even though the MRI of M.M.'s right shoulder did not reveal any post-traumatic findings, Dowd reported that the MRI of the right shoulder "demonstrates a partial tear of the labrum among other findings."

277.    Dowd concluded that right shoulder arthroscopy would be considered for M.M.

278.    However, Dowd failed to describe pre-operative diagnosis reflective of traumatic pathology that had failed a thorough course of conservative treatment suggestive of a need for surgical care.

279.    Despite this, M.M. ultimately underwent right shoulder arthroscopic surgery with Dowd on October 27, 2016.

280.    The right shoulder arthroscopic surgery performed by Dowd for M.M. was essentially a debridement of a partial rotator cuff tear and labral tear with no repairs.

281.    Dowd's operative note also did not reflect post-traumatic findings whereas the pathologies encountered and described by Dowd (i.e., labral pathology and partial rotator cuff pathology) are not the result of accident-related trauma, and thus the procedure was not eligible for coverage under New York's No-Fault law.

282.    Dowd submitted to Allstate a letter of medical necessity dated December 20, 2016 purporting to justify the baseless surgical procedure performed on M.M.'s right shoulder; however, this letter does not provide sufficient information to justify the surgical procedure because it failed to detail any traumatic findings or describe the type of treatment rendered.

283.    Overall, as a means to justify his recommendation for and provision of surgery, Dowd purposely mischaracterized the nature and severity of M.M.'s post-accident condition, including the results of the right shoulder MRI, to make it appear as though M.M. suffered from a true post-traumatic pathology when, in fact, she did not.

284.    Therefore, the surgery of M.M.'s right shoulder was not medically necessary as a result of a motor vehicle accident.

285.     Because the surgery was not medically necessary, and not warranted at all, Dowd had no legal right to seek or collect No-Fault benefit payments in connection with M.M.'s right shoulder surgery.

286.     To the extent that Allstate paid Dowd in reliance on the documents created and submitted by Dowd to support the charges in connection with M.M.'s surgery, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, the payments listed in Exhibit 3.

287.     To the extent that any of the charges submitted by Dowd in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Dowd's charges are not compensable under New York's No-Fault laws.

f.     R.C. (claim no. 0423846500)

288.     Claimant R.C. purportedly was involved in a motor vehicle accident on August 4, 2016.

289.     Following the motor vehicle accident, R.C. was treated at the hospital for complaints of left chest wall pain, left leg pain, and neck pain, and was discharged that same day with prescriptions for ibuprofen and a muscle relaxant. Notably, R.C. did not report any complaints of shoulder pain at the hospital.

290.     Several days later, on August 8, 2016, R.C. sought chiropractic care with a provider in Brentwood, New York and presented with complaints of neck pain, back pain, shoulder pain, and elbow pain.

291.     The following day, R.C. commenced acupuncture treatment at the same Brentwood clinic.

292.    Subsequently, R.C. also began physical therapy treatment with another provider operating out of Brentwood, New York who recommended that R.C. receive physical therapy two (2) to three (3) times per week for twelve (12) weeks.

293.    On September 30, 2016, R.C. underwent an MRI of the left shoulder—which did not identify any clear post-traumatic findings—but did report several findings consistent with arthritis.

294.    R.C. was examined by Dowd on October 21, 2016.

295.    Dowd noted that the MRI of R.C.'s left shoulder demonstrated internal derangement, a superior labral tear from anterior to posterior (SLAP) lesion, and a partial tear of the supraspinatus tendon and also noted positive impingement signs; however, these diagnoses are often unrelated to trauma.

296.    Regardless, Dowd concluded that R.C. had left shoulder internal derangement that was resistant to conservative care and recommended left shoulder arthroscopy.

297.    However, at the time, less than three (3) months had passed since R.C.'s motor vehicle accident and R.C. had just commenced physical therapy on September 8, 2016.

298.    Indeed, Dowd noted in his October 21, 2016 report that "[n]o change with therapy has been had thus far," but failed to acknowledge that R.C. had not yet received adequate conservative care, such as a full course of therapy and a subacromial corticosteroid injection.

299.    Nonetheless, Dowd rushed R.C. into a left shoulder arthroscopic surgery on November 4, 2016 for an apparent degenerative rather than post-traumatic pathology without permitting R.C. to receive the full benefit of therapy for her supposed left shoulder injuries.

300.    During the procedure, Dowd reported that he debrided the labrum, synovitis, and rotator cuff, but no repair of the labrum or rotator cuff was necessary.

42

301.   As such, the operative report illustrates the unnecessary nature of the surgery as the operation did not find or address any accident-related post-traumatic findings.

302.   Moreover, the baseless nature of the surgery is also illustrated by the fact that Dowd found nothing to repair and instead focused his effort on non-accident-related conditions.

303.   Even if R.C.'s supposed left shoulder injuries were caused by the subject accident, the surgery was still unnecessary because R.C.'s supposed conditions were more appropriately treated through a full course of conservative care rather than invasive surgery.

304.   Dowd misrepresented the nature and severity of R.C.'s injuries and the extent of conservative measures attempted prior to surgery as an intentional means to create the (false) impression that R.C.'s left shoulder injury was resistant to therapy, and causally related to the motor vehicle accident, and that the surgery performed for R.C.'s left shoulder was medically necessary.

305.   Dowd doubled down on his misrepresentations regarding the supposed necessity of the left shoulder surgery performed for R.C. through a "letter of medical necessity" dated December 28, 2016 in which Dowd reiterated his demonstrably false claims that surgery was necessary because of R.C.'s complaints of pain that were "unresponsive to conservative care" (even though a full course of therapy had not been completed at the time of Dowd's recommendation for surgery) and "positive MRI findings" (which findings were not related to the underlying motor vehicle accident).

306.   Moreover, although Dowd boasted that the surgery alleviated R.C.'s pain, this claimant still complained to another provider of "sharp, throbbing left shoulder pain" on July 25, 2017, months after the surgery.

307.     Thus, it is clear that Dowd placed profit above patient care when he rushed R.C. into a surgery that, months later, still did not offer her relief.

308.     Because the surgery was not medically necessary and not warranted at all, Dowd had no legal right to seek or collect No-Fault benefits in connection with R.C.'s left shoulder surgery.

309.     To the extent that Allstate paid Dowd in reliance on the documents created and submitted by Dowd to support the charges provided in connection with R.C.'s surgery, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, the payments listed in Exhibit 3.

310.     To the extent that any of the charges submitted by Dowd in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Dowd's charges are not compensable under New York's No-Fault laws.

### B. TRIBOROUGH ORTHOPEDICS' PURPORTED PROVISION OF MEDICALLY UNNECESSARY DME TO ALLSTATE INSUREDS PURSUANT TO DOWD'S UNLAWFUL SELF-REFERRALS

311.     After the surgeries, Dowd continued his scheme to defraud by ordering unnecessary DME for the patients and then purposely having his DME company—Triborough Orthopedics—fill his orders.

312.     In many surgical cases, Dowd ordered DME for the patients regardless of need.

313.     The DME typically consisted of CPM and CTU devices that were owned by Triborough Orthopedics and "rented" to Dowd's patients.

314.     By owning Triborough Orthopedics and by using this company to fulfill his DME orders, Dowd was able to profit from the patients' post-surgical recovery because the assignment of benefits given to Triborough Orthopedics by Dowd's patients allowed Dowd, through

Triborough Orthopedics, to seek No-Fault benefit payments in connection with the DME orders even when the devices were unnecessary, unneeded, and/or unused by patients.

315.    In all cases, Dowd performed relatively minor, simple, and limited surgical procedures that did not require the continued, prolonged use of expensive equipment following the operations.

316.    For example, CPM machines for the shoulder have no proven efficacy, and there is no evidence that such devices are any more useful than standard post-operative physical therapy, which Dowd's patients were also receiving at the time of the DME orders.

317.    Dowd's ordering of DME was an integral part of this scheme.

318.    Indeed, as testified to by Kalkanis, Dowd's requirements that post-surgical DME orders be given to every patient (orders that were fulfilled by Triborough Orthopedics) was well known to Dowd's confederates in the staged accident scam described above.

### 1.    Dowd's Ownership Interest in Triborough Orthopedics

319.    Dowd is the sole owner of Triborough Orthopedics.

320.    As the sole owner of Triborough Orthopedics, Dowd answers to no one and he directly profits from every transaction engaged in by Triborough Orthopedics.

321.    Indeed, Dowd has explicitly represented to Allstate that "there are no partners silent or otherwise" in Triborough Orthopedics and that Triborough Orthopedics is "owned entirely by" Dowd.

322.    Additionally, Dowd has sworn in an affidavit that he is the owner of Triborough Orthopedics, and, as such, is "fully familiar with all the policies, practices and procedures of mailing, creating, and maintaining records in the ordinary course of business for Triborough

Orthopedics, P.C." and it is part of his "duties and responsibilities to ensure that [these policies] pertaining to No-Fault files are adhered to."

323.    Triborough Orthopedics, however, has no definable corporate structure and the company exists solely to facilitate Dowd's scheme to order DME for all of his patients, and then profit from these orders regardless of whether the devices were necessary, needed, or even used.

324.    Throughout the course of this scheme, Dowd has continually blurred the line between himself and Triborough Orthopedics when seeking and collecting payments from insurers.

325.    For instance, Dowd has endorsed in his individual capacity payments made to Triborough Orthopedics and, in doing so, demonstrated how Dowd has purposely disregarded the difference between himself and Triborough Orthopedics.

326.    Dowd and Triborough Orthopedics are essentially one and the same, even sharing the same telephone number despite purposely representing in patient treatment and billing records that Dowd and Triborough Orthopedics maintain separate locations and existences.

327.    Overall, there is ample evidence demonstrating Dowd's financial relationship and connections with Triborough Orthopedics.

328.    Likewise, there is ample evidence demonstrating how Dowd used his ownership of Triborough Orthopedics to engage in referral activities that are prohibited under New York law.

### 2.    *The Defendants' Failure to Properly Disclose to Patients Dowd's Ownership in Triborough Orthopedics Under N.Y. Public Health Law § 238-d*

329.    New York Public Health Law § 238-d prohibits a practitioner from making a referral to a healthcare provider for the furnishing of any health or health related items or services in the event that this practitioner (or the practitioner's immediate family member) has a financial

relationship, including an ownership interest, with such healthcare provider. *See also* 10 N.Y.C.R.R. § 34-1.5(a).

330.    Dowd, as a licensed physician, is a "practitioner" as defined by New York Public Health Law § 238(11).

331.    Triborough Orthopedics, as "a purveyor of health or health related supplies, appliances, or equipment," is a "health care provider" as defined by New York Public Health Law § 238(6).

332.    Under section 238-d, when a practitioner, like Dowd (who owns Triborough Orthopedics), refers a patient for DME to another healthcare provider, like Triborough Orthopedics, in which the practitioner has an ownership interest (and where the referral is not otherwise prohibited or excepted by section 238-a), the practitioner must disclose to the patient his or her ownership interest in the other healthcare provider.

333.    Under 10 N.Y.C.R.R. § 34-1.5, this disclosure must be in the form specified in section 34-1.6 and must "also be posted prominently in the practitioner's office."

334.    This disclosure must provide notice of the financial relationship, and the disclosure must also inform the patient of his or her right to use a different healthcare provider if any such other provider is reasonably available. *See* N.Y. Pub. Health Law § 238-d(2); 10 N.Y.C.R.R. § 34-1.5(b).

335.    In the case of Triborough Orthopedics, because the company fulfills DME orders made by Dowd while Dowd maintains an ownership interest in the company, Triborough Orthopedics is not eligible for No-Fault reimbursement if Dowd and the company fail to comply with the disclosure provisions of New York Public Health Law § 238-d and 10 N.Y.C.R.R. § 34-1.5.

336.    During the course of this scheme, Dowd never properly disclosed to any of his patients in the form prescribed by 10 N.Y.C.R.R. § 34-1.6 his ownership interest in Triborough Orthopedics when ordering DME for his surgical patients and then causing Triborough Orthopedics to fulfill—and then bill Allstate for—these orders.

337.    Even though some of Dowd's patients, in limited cases, supposedly were given and caused to sign documents styled as "Patient Certifications," these so-called certifications failed to comply with the requirements of 10 N.Y.C.R.R. § 34-1.6.

338.    For example, by failing to employ the exact language required by 10 N.Y.C.R.R. § 34-1.6 in Dowd's self-styled certifications, Dowd purposely failed to inform his patients that the DME orders placed to and fulfilled by Triborough Orthopedics were unlawful unless Dowd disclosed his ownership interest and provided information about alternative providers.

339.    While Dowd, in limited instances, disclosed his ownership interest in Triborough Orthopedics, Dowd never gave the patients information about alternative providers.

340.    Instead, the DME was ordered and then, in most cases, was dispensed and/or delivered by Triborough Orthopedics.

341.    As a transient provider, Dowd evaluated, treated, and ordered DME from patients at various different facilities around New York; however, upon information and belief, Dowd failed to meet the requirements of 10 N.Y.C.R.R. § 34-1.5(b) by purposely not displaying the necessary written disclosure forms and notices at each of the clinics.

342.    Thus, Dowd's patients were never given any meaningful choice of where to fill Dowd's DME prescriptions for the CPM or CTU devices; in fact, Dowd's patients were never given any alternative to Triborough Orthopedics.

343.    According to testimony provided to Allstate by E.E. (claim no. 0387317456), Dowd "told [him] that he was going to send a machine to do exercise with."

344.    Based on Dowd's prescription, these items (a CPM machine for the shoulder and a CTU) were dispensed to E.E. by Triborough Orthopedics on November 25, 2015.

345.    When given the DME prescription, E.E. was never informed of Dowd's ownership interest in Triborough Orthopedics, and also was never given a choice of where to obtain this equipment.

346.    In the case of claimant E.E., Dowd's surgical procedure was unnecessary and unwarranted given E.E.'s actual condition, including the fact that E.E.'s purported shoulder injuries, if any, were degenerative in nature and were not related to the accident.

347.    Dowd then compounded the effect of his unlawful conduct by ordering DME that was expensive and not warranted.

348.    Dowd then exacerbated his wrongdoing by failing to properly disclose his ownership interest in Triborough Orthopedics.

349.    Dowd's willful failure to properly disclose his financial relationship with Triborough Orthopedics—combined with his performance of unnecessary surgeries and subsequent orders for DME for many patients regardless of need—demonstrates how Dowd routinely and regularly placed his own financial interests ahead of his patients' well-being.

350.    Based on Dowd's misconduct, Triborough Orthopedics is not, and never has been, eligible for reimbursement for any and all DME prescribed by Dowd and furnished by Triborough Orthopedics, including, but not limited to, the claims for reimbursement listed in Exhibit 4 relating to the CPM and CTU devices purportedly furnished to Allstate insureds pursuant to a prescription from Dowd.

49

351.    To the extent that Allstate paid Triborough Orthopedics in reliance on the documents created and submitted to Allstate by, or on behalf of, Dowd and Triborough Orthopedics in connection with any DME prescribed by Dowd, Allstate is entitled to recover all payments made to Triborough Orthopedics in connection with any such DME, including, but not limited to, those payments listed in Exhibit 5.

352.    Additionally, to the extent that any of Triborough Orthopedics' charges submitted in connection with DME prescribed by Dowd remain unpaid (including, but not limited to, the claims listed in Exhibit 4), Allstate is under no obligation to make any payments in connection with those transactions to the extent that those claims arose from Dowd's improper self-referrals, and therefore are not compensable under New York's No-Fault law.

### 3.    Lack of Medical Necessity for CPM and CTU Devices

353.    Dowd prescribes CPM and CTU devices for many of his surgery patients following arthroscopic procedures.

354.    Dowd prescribes all of these CPM and CTU devices using a pre-printed prescription form that limits the available devices only to CPM for the shoulder (E0936), CPM for the knee (E0935), and CTU (E0236).

355.    The language used in the prescription form states that the CPM is a motorized device meant to move the patient's joint through a prescribed range of motion for an extended period of time.

356.    The prescription form also describes the CTU devices as "a motorized pump" that "circulates cold water and may also provide pneumatic compression" with the use of "a pad or cryocuff that connects to the cold therapy unit."

357.     According to the documents created and submitted to Allstate, Dowd represented that the CPM devices were prescribed to patients because they were necessary to help improve the patients' range of motion and to prevent stiffness.

358.     Dowd's representations about the necessity and effectiveness of the CPM and CTU devices were false.

359.     Dowd's pre-printed DME prescription form includes a statement from Dowd explaining his reasons for prescribing the DME.

360.     In the statement, Dowd claims that studies have shown that CPM devices help patients recover faster after surgery, and that the patient's use of the CPM device will "significantly accelerate recovery time."

361.     Dowd's statement is false because the effectiveness of CPM devices in recovery from minor arthroscopic procedures, like the ones performed by Dowd, has never been proven.

362.     In fact, the most recent studies find that CPM device use after total knee replacement did not improve, or even affect, recovery outcomes.

363.     However, even if the devices are suitable in limited cases, they were still not warranted in this case because Dowd's surgeries were minimally invasive arthroscopic surgeries that did not require the use of CPM devices during recovery.

364.     Specifically, minimally invasive arthroscopic surgeries do not involve extensive soft tissue cutting, which may cause soft tissue and joint contractures.

365.     Dowd never documented any anticipation of excessive post-operative swelling or stiffness, and also never documented any complications or conditions that would have warranted the use of CPM and CTU devices.

366.    Dowd also prescribed DME to many of his patients regardless of need, and then required the patients to use these devices for long periods of time after the surgery.

367.    For example, Dowd prescribed a CPM device to a patient even though the patient already demonstrated a full range of motion.

368.    In such instances, where there is no risk of flexion contracture (i.e., decreased range of motion and inability to bend the joint) or inability to bear weight, the use of a CPM device is outside of the standard of care.

369.    Even in limited cases in which CPM device usage may be indicated, the CPM device should be prescribed within days of the surgery, and then used for only a limited period until active physical therapy can be tolerated.

370.    Dowd was aware that CPM and CTU devices, if ever required in the first place, must be deployed quickly following the patient's surgery.

371.    Indeed, in his claim submissions, Dowd declared that "[g]enerally, CPM is initiated within 24 to 48 hours following surgery and is accompanied by the use of a cold therapy unit (CTU)."

372.    In other documentation submitted to Allstate, Dowd also cites to the Centers for Medicare and Medicaid Services National Coverage Determination (NCD) for Durable Medical Equipment (DME) Reference List (280.1), which states that coverage for CPM devices is only available if the patient's use of the device commences within two (2) days following surgery.

373.    Despite knowing the value and necessity of a prompt start, Dowd purposely disregarded these guidelines so he could meet his goal of ordering DME for a number of his surgery patients. Indeed, many of Dowd's patients were started on CPM and CTU devices long after the surgery, including the following patients:

52

| Patient | Claim No. | Date of Surgery | Date CPM Received | Days Between Surgery and CPM |
|---------|-----------|-----------------|-------------------|------------------------------|
| D.U. | 0371238460 | 9/28/2015 | 10/12/2015 | 14 |
| Y.B. | 0356683169 | 3/9/2015 | 3/28/2015 | 19 |
| R.C. | 0423846500 | 11/4/2016 | 11/18/2016 | 14 |
| E.M. | 0384018503 | 6/27/2016 | 7/4/2016 | 7 |
| T.B. | 0353656473 | 3/20/2015 | 3/29/2015 | 9 |
| J.G. | 0382017275 | 3/18/2016 | 3/26/2016 | 8 |
| E.M. | 0436891501 | 12/1/2016 | 12/12/2016 | 11 |
| D.E. | 0358442879 | 3/27/2015 | 4/4/2015 | 8 |

374.    Dowd also knew that CPM and CTU devices were only effective in limited cases, and that even when the devices are clinically warranted for recovery, the use of the devices is only effective for a short time.

375.    Indeed, in his own claim submission documents, Dowd acknowledges that CPM devices are utilized (and covered by insurers) only under very limited circumstances (e.g., when patients are recovering from a total knee replacement); however, even these statements by Dowd are misleading (or simply false) because most recent studies have found that post-operative usage of CPM devices does not improve or accelerate recovery outcomes for total knee replacements.

376.    Moreover, even when warranted, the devices only have an effective use period of three (3) weeks because there is insufficient evidence to justify use of these devices for longer periods of time or for different applications.

377.    Despite this knowledge, Dowd ordered DME in inappropriate cases and for wholly excessive periods of time.

378.    For example, none of the Allstate claimants underwent a total knee replacement; rather, the surgeries performed on them by Dowd were minimally invasive and limited in scope.

379.    Additionally, Dowd purposely ordered the use of these devices for excessive periods of time.

380.     In every case, Dowd ordered the use of CPM devices for a period of six (6) weeks following the surgeries, which caused the devices to be used long after the devices would stop being effective, assuming that CPM device usage was even necessary and warranted by the patients' condition (which it never was due to the minor and limited nature of the operations).

381.     Dowd's intentionally excessive DME order then allows Triborough Orthopedics to dispense the devices to Allstate claimants under a forty-two (42) day "rental" agreement.

382.     Under New York's No-Fault laws, this arrangement allowed Triborough Orthopedics to bill Allstate (on each claimant's behalf) for each day that the device was supplied.

383.     Because Triborough Orthopedics owned the CPM devices and because Dowd owned Triborough Orthopedics, Dowd personally—and unlawfully—profited from each and every excessive CPM device prescription that he gave to his surgery patients.

384.     Dowd's prescriptions for CTU devices were also unnecessary and unwarranted.

385.     Following many surgeries, Dowd ordered the use of a CTU device for his patients.

386.     In most instances, Dowd's orders for CTU devices were filled by Triborough Orthopedics, which charged Allstate $294.00 for each device.

387.     Instead of these expensive devices, Dowd's patients could have received the same or better results by using regular ice packs or similar items, which are available at a fraction of the price charged to Allstate by Triborough Orthopedics for the CTU devices.

388.     In addition to their excessive cost, the use of the CTU devices themselves was redundant and unnecessary because all of Dowd's surgery patients were also undergoing physical therapy during their post-surgery recovery phase, treatment which included the application of an ice modality during each office visit thus eliminating the need for a specialized ice device.

389.    Therefore, the CPM and CTU devices prescribed by Dowd and dispensed by Triborough Orthopedics were not medically necessary.

390.    Consequently, Triborough Orthopedics is not, and never has been, eligible for reimbursement under New York's No-Fault law for the CPM and CTU devices purportedly furnished to Allstate insureds.

391.    To the extent that Allstate paid Triborough Orthopedics in reliance on the documents created and submitted to Allstate by, or on behalf of, Dowd and Triborough Orthopedics in connection with CPM and CTU devices purportedly dispensed to Allstate claimants, Allstate is entitled to recover all payments made to Triborough Orthopedics in connection with any such DME, including, but not limited to, the payments listed in Exhibit 5.

392.    Additionally, to the extent that any of Triborough Orthopedics' charges submitted in connection with CPM and CTU devices purportedly dispensed to Allstate claimants remain unpaid (including, but not limited to, the claims listed in Exhibit 4), Allstate is under no obligation to make any payments in connection with those transactions as these devices were medically unnecessary, and therefore are not compensable under New York's No-Fault law.

### 4.    *Specific Examples of Triborough Orthopedics' Dispensing of Medically Unnecessary CPM and CTU Devices*

393.    After many surgeries, Dowd prescribed CPM and/or CTU devices for his patients, and then caused Triborough Orthopedics to provide the devices to patients, even those patients who did not want them or who were unaware that Dowd had ordered them.

394.    Indeed, Dowd's surgery patients did not need the CPM and CTU devices for their recovery.

395.    In the first place, the use of these devices has not been proven effective in accelerating or enhancing post-surgical recovery, except in very limited circumstances.

396. Second, the surgeries performed by Dowd were not the type for which these devices might aid in recovery.

397. Third, even if the devices could have helped accelerate or enhance the patients' post-surgery recovery (they could not), the provision of these devices was still unnecessary and unwarranted because Dowd's purposely excessive prescriptions caused the devices to be used long after they were necessary and effective, which also resulted in Triborough Orthopedics submitting excessive device rental charges to Allstate.

398. The following claims exemplify Triborough Orthopedics' dispensing of medically unnecessary CPM and/or CTU devices to Allstate claimants.

        a.     <u>R.C. (claim no. 0423846500)</u>

399. Claimant R.C. underwent left shoulder arthroscopy performed by Dowd on November 4, 2016.

400. R.C. was next examined by Dowd two (2) weeks after the surgery on November 18, 2016.

401. Dowd's examination of R.C. resulted in a prescription for a CPM device.

402. According to a delivery acknowledgement form signed by R.C., the CPM device was delivered to R.C. that same day.

403. Dowd's prescription of the CPM device was unnecessary, unwarranted, and unlawful.

404. In this case, the CPM device was not medically necessary or warranted for R.C.'s recovery because the device was not prescribed and implemented until two (2) weeks after the surgery.

405.    Dowd's prescription of the CPM device was also unlawful in this instance because Dowd failed to properly disclose his ownership of Triborough Orthopedics in accordance with New York Public Health Law § 238-d when ordering the prescription and making the referral to Triborough Orthopedics.

406.    Therefore, Triborough Orthopedics is not entitled to No-Fault reimbursement for its charges relating to the CPM device purportedly dispensed to claimant R.C.

407.    To the extent that Allstate paid Triborough Orthopedics in reliance on the documents created and submitted by, or on behalf of, Dowd and Triborough Orthopedics to support the charges for the DME purportedly dispensed to R.C., Allstate is entitled to recover all payments made to Triborough Orthopedics in connection with these claims, including, but not limited to, the payments listed in Exhibit 5.

408.    To the extent that any of the charges submitted by, or on behalf of, Dowd and Triborough Orthopedics in connection with these claims for DME remain unpaid, Allstate has no further obligation to make payment in connection with these claims (including, but not limited to, those claims listed in Exhibit 4) because Triborough Orthopedics' charges are not compensable under New York's No-Fault laws.

b.    C.J. (claim no. 0392722443)

409.    Claimant C.J. underwent right shoulder arthroscopic surgery with Dowd on February 5, 2016.

410.    Dowd's operative report does not identify any complications or anticipated swelling or stiffness.

411.    Several days later, on February 9, 2016, a CPM device and a CTU device, pursuant to a prescription from Dowd, were delivered to C.J. by Triborough Orthopedics.

412.     The CPM device was prescribed for four (4) to six (6) weeks while the CTU device was prescribed for fourteen (14) days.

413.     Dowd's prescription of the CPM and CTU devices was unnecessary, unwarranted, and unlawful.

414.     In this case, the CPM device was not medically necessary or warranted for C.J.'s post-surgery recovery because the use of CPM devices has not been proven to accelerate or enhance patient recovery from minor, limited operations like the arthroscopic procedure purportedly performed upon C.J.

415.     Dowd's prescription of the CPM device was also excessive and therefore not reasonable or warranted because Dowd's orders purposely caused Triborough Orthopedics to rent, and C.J. to use, the device long after it stopped being effective.

416.     Dowd's prescription of the CTU device was also excessive and medically unnecessary given the minimally invasive and minor nature of the arthroscopic surgery purportedly performed upon C.J.

417.     Dowd's prescription of the CPM and CTU devices was also unlawful in this instance because Dowd failed to properly disclose his ownership of Triborough Orthopedics in accordance with New York Public Health Law § 238-d when ordering the prescription and making the referral to Triborough Orthopedics.

418.     Therefore, Triborough Orthopedics is not entitled to No-Fault reimbursement for its charges relating to the CPM and CTU devices purportedly dispensed to claimant C.J.

419.     To the extent that Allstate paid Triborough Orthopedics in reliance on the documents created and submitted by, or on behalf of, Dowd and Triborough Orthopedics to support the charges for the DME purportedly dispensed to C.J., Allstate is entitled to recover all

payments made to Triborough Orthopedics in connection with these claims, including, but not limited to, the payments listed in Exhibit 5.

420.    To the extent that any of the charges submitted by, or on behalf of, Dowd and Triborough Orthopedics in connection with these claims for DME remain unpaid, Allstate has no further obligation to make payment in connection with these claims (including, but not limited to, those claims listed in Exhibit 4) because Triborough Orthopedics' charges are not compensable under New York's No-Fault laws.

c.      L.B. (claim no. 0392815700)

421.    Claimant L.B. underwent right knee arthroscopy with Dowd on January 8, 2016.

422.    On January 10, 2016, Triborough Orthopedics delivered a CPM device to L.B. pursuant to a prescription from Dowd.

423.    Dowd's prescription of the CPM device was unnecessary, unwarranted, and unlawful.

424.    In this case, the CPM device was not medically necessary or warranted for L.B.'s post-surgery recovery because the use of CPM devices has not been proven to accelerate or enhance patient recovery from minor, limited operations like the arthroscopic procedure performed upon L.B.

425.    Additionally, Dowd's prescription of the CPM device was also excessive and therefore not reasonable or warranted because Dowd's orders purposely caused L.B. to use the device long after it stopped being effective.

426.    Dowd's prescription of the CPM device was also unlawful in this instance because Dowd failed to properly disclose his ownership in Triborough Orthopedics in accordance with

New York Public Health Law § 238-d when ordering the prescription and making the referral to Triborough Orthopedics.

427.    Indeed, L.B. was not given any meaningful choice as to where to obtain the equipment, if at all.

428.    For these reasons, Triborough Orthopedics is not entitled to No-Fault reimbursement for its charges relating to the CPM device purportedly dispensed to claimant L.B.

429.    To the extent that Allstate paid Triborough Orthopedics in reliance on the documents created and submitted by, or on behalf of, Dowd and Triborough Orthopedics to support the charges for the DME purportedly dispensed to L.B., Allstate is entitled to recover all payments made to Triborough Orthopedics in connection with these claims, including, but not limited to, the payments listed in Exhibit 5.

430.    To the extent that any of the charges submitted by, or on behalf of, Dowd and Triborough Orthopedics in connection with these claims for DME remain unpaid, Allstate has no further obligation to make payment in connection with these claims (including, but not limited to, those claims listed in Exhibit 4) because Triborough Orthopedics' charges are not compensable under New York's No-Fault laws.

C.    DOWD'S IMPROPER AND FRAUDULENT BILLING PRACTICES

431.    Following the performance of medically unnecessary and unwarranted surgeries and the prescription of unneeded and ineffective DME, the final aspect of the defendants' scheme involved the submission of inflated and fraudulent charges when seeking No-Fault benefit payments from Allstate.

432.    To achieve their goal of exploiting patients and then extracting the maximum amount of reimbursement from the patients' available No-Fault benefits, the defendants purposely and repeatedly submitted false and fraudulent charges when seeking payment from Allstate.

433.    Because of the misconduct described below, none of the defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

### 1.    *Dowd's Fraudulent Billing Practices*

434.    Dowd's billing practices are fraudulent and unlawful in several respects.

435.    As detailed herein, Dowd purposely violated the Fee Schedule's reimbursement requirements by, among other things, charging excessive fees for arthroscopic surgeries, office visits, and consultations.

436.    In New York, the Fee Schedule is used by providers and insurers to determine the level of reimbursement payable on legitimate claims.

437.    The Fee Schedule uses Current Procedure Terminology ("CPT") codes, modifiers, and descriptions.

438.    CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental healthcare payors.

439.    Dowd submitted false and fraudulent charges to Allstate for surgical procedures using CPT codes.

### a.    Unbundling of CPT Codes

440.    "Unbundling" of CPT codes is an example of a fraudulent and abusive billing tactic.

441.   Unbundling occurs when multiple CPT codes are billed for the component parts of a procedure when there is a single code available that includes the complete procedure.

442.   With respect to certain of the arthroscopic surgeries purportedly performed by Dowd, Dowd wrongfully unbundled the charges associated with the procedures to purposely obtain payments that exceeded the amounts permissible under the Fee Schedule.

### i.   *CPT Code 29877*

443.   In connection with arthroscopic knee surgeries, Dowd submitted a charge to Allstate under CPT code 29877-59, along with a corresponding charge under CPT codes 29880 and 29881.

444.   Dowd's charges for these surgical procedures are fraudulent and therefore not compensable because the discrete service charged under CPT code 29877-59 (i.e., chondroplasty) is also included among the services that are charged under CPT codes 29880 and 29881.

445.   Therefore, by charging CPT code 29877 along with CPT codes 29880 or 29881 for the same procedure performed on the same knee, Dowd sought to be paid twice for the same procedure.

446.   Dowd purposely sought to conceal his unbundling of these charges by using the modifier "-59" with CPT code 29877, which is used to designate a distinct procedural service.

447.   However, modifier -59 is only appropriate where documentation supports a different session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury not ordinarily encountered or performed on the same day by the same individual.

448.   In all cases, Dowd did not perform a distinct service and thus the use of the -59 modifier is not appropriate.

449.    Dowd purposely misrepresented the nature and extent of the services provided as a means to obtain payments that Allstate had no obligation to make.

450.    By routinely including a charge under CPT code 29877-59 in one or more bill submitted to Allstate seeking reimbursement for medically unnecessary and/or premature arthroscopic knee procedures under CPT codes 29880 or 29881, Dowd improperly inflated his bills by up to approximately $1,628.00.

*ii.*    *CPT Code 29875*

451.    Dowd also submitted charges to Allstate under CPT codes 29875 and 29876 in connection with the same procedure.

452.    CPT codes 29875 and 29876 are used to report arthroscopic synovectomy (i.e., removal of connective tissue lining the knee joint).

453.    CPT codes 29875 and 29876 should not be reported together, because the limited synovectomy (CPT code 29875) is included as a part of the major synovectomy (CPT code 29876).

454.    By charging CPT code 29875 and CPT code 29876 for the same procedure performed in the same area, Dowd purposely sought excessive payments for the same procedure as the unlawful unbundling of the charges inflated Dowd's bills for this procedure by approximately $1,639.00.

*iii.*    *CPT Code 29846*

455.    Additionally, Dowd submitted charges to Allstate reporting both CPT codes 29845 and 29846 for the same wrist during the same operative session.

456.    CPT code 29845 is used to report a wrist arthroscopy with complete synovectomy (i.e., removal of connective tissue) while CPT code 29846 is used to report wrist arthroscopy with the excision and/or repair of triangular fibrocartilage and/or joint debridement.

457. Providers cannot charge under both CPT codes 29845 and 29846 for the same wrist surgery because the services charged for under CPT code 29846 are included in the charge for CPT code 29845.

458. By charging CPT codes 29845 and 29846 for the same procedure in the same area, Dowd purposely sought excessive payments from Allstate.

459. The unlawful unbundling of these charges inflated Dowd's bills for this procedure by approximately $1,756.00.

460. Overall, because these charges relating to surgical procedures purportedly provided to Allstate claimants were in excess of the amount permitted under the Fee Schedule, the charges submitted to Allstate in connection with these unbundled services are not compensable under New York's No-Fault laws.

461. To the extent that Allstate paid Dowd in reliance on the documents created and submitted to Allstate by Dowd in connection with such surgical procedures provided to Dowd's patients, Allstate is entitled to recover all payments made to Dowd in connection with any such procedures, including, but not limited to, those payments listed in Exhibit 3.

462. Moreover, to the extent that any of the charges submitted by Dowd to Allstate in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 2), Allstate is under no obligation to make any payments to Dowd in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault laws.

        b.      Improper Billing for Diagnostic Arthroscopy in Conjunction With Surgical Arthroscopy

463. Dowd submitted charges to Allstate for diagnostic arthroscopy in conjunction with charges for surgical arthroscopy.

464.    However, when both a diagnostic and surgical arthroscopy are performed, the diagnostic arthroscopy is an inclusive component of the surgical arthroscopy and is not to be reported separately.

465.    For instance, CPT codes 29870, 29805, and 29840 are for diagnostic arthroscopy, yet, on one or more occasion, Dowd charged for these diagnostic arthroscopic procedures along with the surgical arthroscopy that was purportedly performed.

466.    Because Dowd's charges relating to diagnostic arthroscopy procedures purportedly provided to Allstate claimants were in excess of the amount permitted under the Fee Schedule, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault laws.

467.    To the extent that Allstate paid Dowd in reliance on the documents created and submitted to Allstate by Dowd in connection with such diagnostic procedures provided to Dowd's patients, Allstate is entitled to recover all payments made to Dowd in connection with any such procedures, including, but not limited to, those payments listed in Exhibit 3.

468.    Moreover, to the extent that any of the charges submitted by Dowd to Allstate in connection with these diagnostic services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 2), Allstate is under no obligation to make any payments to Dowd in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault laws.

c.      Failure to Comply with Surgery Ground Rule 5

469.    Dowd failed to comply with the Fee Schedule's Surgery Ground Rule 5 and, in doing so, purposely submitted unlawfully excessive charges in connection with multiple or bilateral procedures.

65

470.    Surgery Ground Rule 5 states that "[w]hen multiple procedures, unrelated to the major procedure and adding significant time or complexity, are provided at the same operative session, payment is for the procedure with the highest allowance plus half of the lesser procedures."

471.    Procedures performed by Dowd with the highest allowance include the following: (a) CPT code 29823 (arthroscopic shoulder surgery, debridement, extensive); (b) CPT code 29881 (arthroscopic knee surgery, with menisectomy (medial AND lateral, including any meniscal shaving), including debridement/shaving of articular cartilage (chondroplasty), same or separate compartment(s)); (c) CPT code 29880 (arthroscopic knee surgery, with meniscectomy (medial OR lateral, including any meniscal shaving, including debridement/shaving of articular cartilage (chondroplasty), same or separate compartment(s)); (d) CPT code 29827 (arthroscopic shoulder surgery with rotator cuff repair); and (e) CPT code 29807 (arthroscopic surgery, repair of SLAP lesion).

472.    If performed on their own, a provider would be entitled to full payment under the Fee Schedule for these procedures assuming they were medically necessary.

473.    However, if other procedures are included in the same operative report, Ground Rule 5 requires that these lesser procedures be billed at fifty percent (50%).

474.    In this case, Dowd regularly billed for primary procedures and for other lesser procedures during the same operative session.

475.    Dowd, however, regularly violated Ground Rule 5 by failing to properly reduce the charges for the lesser included procedures.

476.    By way of a representative example, Dowd charged Allstate for arthroscopic surgery of the left shoulder for claimant E.E. (claim no. 0387317456) as follows:

66

| Date of Procedure | Place of Service | CPT Code | Amount Charged by Dowd | Amount Actually Permitted Under Fee Schedule |
|---|---|---|---|---|
| 11/20/2015 | Glendale, NY 11385 | 29823 | $1,878.12 | $1,878.12 |
| 11/20/2015 | Glendale, NY 11385 | 29825 | $1,874.00 | $936.77 |
| 11/20/2015 | Glendale, NY 11385 | 29821 | $1,780.00 | $889.82 |
| 11/20/2015 | Glendale, NY 11385 | 29826 | $451.13 | $451.13 |
| | | **TOTAL:** | $5,983.25 | $4,155.84 |

477.     In the example above, Dowd unlawfully inflated the bill for this procedure by $1,827.41 by ignoring Ground Rule 5's required reductions for procedures billed under CPT codes 29821 and 29825 (assuming, in the first place, that the surgery was necessary to address an accident-related injury, which it was not).

478.     As another example, Dowd charged Allstate for the arthroscopic surgery of the knee for claimant L.B. (claim no. 0392815700) as follows:

| Date of Procedure | Place of Service | CPT Code | Amount Charged by Dowd | Amount Actually Permitted Under Fee Schedule |
|---|---|---|---|---|
| 1/8/2016 | Glendale, NY 11385 | 29880 | $2,471.34 | $2,471.34 |
| 1/8/2016 | Glendale, NY 11385 | 29876 | $1,878.13 | $939.06 |
| 1/8/2016 | Glendale, NY 11385 | 29877 | $1,628.47 | $0.00 |
| | | **TOTAL:** | $5,977.94 | $3,410.40 |

479.     In the example above, Dowd unlawfully inflated the bill for this procedure by $939.00 by ignoring Ground Rule 5's required reductions for procedures billed under CPT codes

29876 and 29880, in addition to the improper charge of $1,628.47 as a result of the unbundling of CPT code 29877 from CPT code 29880 (assuming, in the first place, that the surgery was necessary to address an accident-related injury, which it was not).

480.    By way of another example, Dowd charged Allstate for the arthroscopic shoulder surgery of claimant C.J. (claim no. 0392722443) as follows:

| Date of Procedure | Place of Service | CPT Code | Amount Charged by Dowd | Amount Actually Permitted Under Fee Schedule |
|---|---|---|---|---|
| 2/5/2016 | Glendale, NY 11385 | 29827 | $2,135.00 | $2,134.65 |
| 2/5/2016 | Glendale, NY 11385 | 29823 | $1,878.12 | $939.06 |
| 2/5/2016 | Glendale, NY 11385 | 29825 | $1,874.00 | $936.77 |
| 2/5/2016 | Glendale, NY 11385 | 29824 | $1,186.43 | $593.21 |
| 2/5/2016 | Glendale, NY 11385 | 29821 | $1,780.00 | $889.82 |
| 2/5/2016 | Glendale, NY 11385 | 29826 | $451.13 | $451.21 |
| | | TOTAL: | $9,304.68 | $5,944.72 |

481.    In the example above, Dowd unlawfully inflated the bill for this procedure by $3,359.96 by ignoring Ground Rule 5's required reductions for procedures billed under CPT codes 29823, 29824, 29825, 29826, and 29827 (assuming, in the first place, that the surgery was necessary to address an accident-related injury, which it was not).

482.    Because Dowd's charges relating to surgical procedures purportedly provided to Allstate claimants were charged in excess of the amount permitted under the Fee Schedule and were purposely misrepresented, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault laws.

483.     To the extent that Allstate paid Dowd in reliance on the documents created and submitted to Allstate by Dowd in connection with these surgical procedures provided to Dowd's patients, Allstate is entitled to recover all payments made to Dowd in connection with any such procedures, including, but not limited to, those payments listed in Exhibit 3.

484.     Moreover, to the extent that any of the charges submitted by Dowd to Allstate in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 2), Allstate is under no obligation to make any payments to Dowd in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault laws.

d.     Failure to Apply Required Reduction for Physician Assistant Services

485.     In nearly all instances in which Dowd was assisted during a surgical procedure, the surgical assistant was a physician assistant. The correct modifier to be used under the Fee Schedule when reporting such services performed by a physician assistant in assisting surgical procedures is modifier -83.

486.     However, Dowd routinely misrepresented the services performed by his physician assistant by using modifier -80, which modifier is to be used for services performed by an assistant surgeon.

487.     Under Surgery Ground Rule 12(F) of the Fee Schedule, "[s]ervices of physician assistants and nurse practitioners assisting during surgical procedures will be paid at two-thirds of the surgical assistant percentage (16.0 percent). Physician assistants will receive 10.7 percent of the total allowance for the surgical procedure."

488.    Not only did Dowd routinely fail to use the appropriate modifier to indicate that a physician assistant assisted him in the surgical procedure, but he failed to apply the 10.7% reduction applicable to the fees for such services.

489.    For instance, Allstate claimant J.G. (claim no. 0382017275) underwent arthroscopic shoulder surgery with Dowd on March 18, 2016. According to the operative report for this procedure, Robert Riselvato, PA assisted in this procedure.

490.    At all relevant times, Robert Riselvato was a physician assistant licensed in the State of New York.

491.    However, the bill submitted to Allstate for the March 18, 2016 procedure reports Robert Riselvato, PA's services using modifier -80.

492.    By way of a representative example, Dowd improperly charged Allstate for Robert Riselvato, PA's services during the June 2, 2016 procedure for claimant J.T. (claim no. 0404225120) as follows:

| Date of Procedure | Place of Service | CPT Code | Amount Charged by Dowd for Assistant Services | Total Allowance for Procedure Under Fee Schedule | 10.7% Physician Assistant Fee |
|---|---|---|---|---|---|
| 6/2/2016 | Glendale, NY 11385 | 29881-80 | $402.65 | $2,013.26 | $215.42 |
| 6/2/2016 | Glendale, NY 11385 | 29876-80 | $458.08 | $939.06 | $100.48 |
| 6/2/2016 | Glendale, NY 11385 | 29877-80, 59 | $325.69 | $0.00 | $0.00 |
| | | **TOTAL:** | $1,186.42 | $2,952.32 | $315.90 |

493.    As set forth in the above chart, Dowd charged approximately $870.00 more than the permissible charge for his physician assistant's services under the Fee Schedule (assuming that the underlying surgical procedure was compensable under the Fee Schedule, which it was not).

494. Similarly, Dowd charged Allstate for Robert Riselvato, PA's services during the November 20, 2016 procedure for claimant E.E. (0387317456) as follows:

| Date of Procedure | Place of Service | CPT Code | Amount Charged by Dowd for Assistant Services | Total Allowance for Procedure Under Fee Schedule | 10.7% Physician Assistant Fee |
|---|---|---|---|---|---|
| 11/20/2015 | Glendale, NY 11385 | 29823-80 | $375.62 | $1,878.12 | $200.96 |
| 11/20/2015 | Glendale, NY 11385 | 29825-80 | $374.80 | $936.77 | $100.23 |
| 11/20/2015 | Glendale, NY 11385 | 29821-80 | $356.00 | $889.82 | $95.21 |
| 11/20/2015 | Glendale, NY 11385 | 29826-80 | $90.22 | $451.13 | $48.27 |
| | | TOTAL: | $1,196.64 | $4,155.84 | $444.67 |

495. As set forth in the chart above, Dowd charged approximately $751.00 more than the permissible charge for his physician assistant's services under the Fee Schedule (assuming that the underlying surgical procedure was compensable under the Fee Schedule, which it was not).

496. Therefore, by charging in excess of the Fee Schedule and failing to apply the 10.7% reduction applicable to physician assistant services, Dowd routinely and improperly inflated his bills for medically unnecessary and/or premature surgical procedures by hundreds of dollars.

497. Because Dowd's charges relating to services purportedly provided to Allstate claimants by his physician assistant(s) were charged in excess of the amount permitted under the Fee Schedule and purposely misrepresented, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault laws.

498. To the extent that Allstate paid Dowd in reliance on the documents created and submitted to Allstate by Dowd in connection with such services provided to Dowd's patients,

71

Allstate is entitled to recover all payments made to Dowd in connection with any such services, including, but not limited to, those payments listed in Exhibit 3.

499.     Moreover, to the extent that any of the charges submitted by Dowd to Allstate in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 2), Allstate is under no obligation to make any payments to Dowd in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault laws.

> e.     Improper Billing for Follow-Up Visits Within Ninety Days of Surgery

500.     Dowd routinely billed for an examination of an established patient under CPT codes 99213 and 99214 following a patient's surgery.

501.     According to Surgery Ground Rule 1B of the Fee Schedule regarding "Package or Global Fee Concept," "[l]isted values for all surgical procedures include the surgery, local infiltration, digital or regional block, and/or topical anesthesia when used and the *normal follow-up care* for the period indicated in days in the column headed 'FUD.'" (Emphasis added.).

502.     The FUD column lists the follow-up days included in a surgical procedure's global charge.

503.     In counting follow-up days, day one is the day of the surgery.

504.     Where the FUD column contains the letter designation "ZZZ," this indicates that the service is an add-on service, and, therefore, is treated as in the global period of the primary procedure that is billed in conjunction with the ZZZ service.

505.     According to Surgery Ground Rule 6(A) regarding follow-up care or aftercare, "[n]ormal postoperative care is included with all services assigned follow-up days of 0, 10, or 90."

506.    The CPT codes for the surgical procedures reported by Dowd have ninety (90) assigned follow-up days in the column headed "FUD." Examples of such codes include, but are not necessarily limited to, those codes set forth in the chart below:

| CPT Code | Description | FUD |
|---|---|---|
| 29805 | Arthroscopy, shoulder, diagnostic; with or without synovial biopsy | 090 |
| 29807 | Arthroscopy, shoulder, surgical; repair of SLAP lesion | 090 |
| 29821 | Arthroscopy, shoulder, surgical; synovectomy; complete | 090 |
| 29822 | Arthroscopy, shoulder, surgical; debridement, limited | 090 |
| 29823 | Arthroscopy, shoulder, surgical; debridement, complete | 090 |
| 29824 | Arthroscopy, shoulder, surgical; distal claviculectomy including distal articular surface (Mumford procedure) | 090 |
| 29825 | Arthroscopy, shoulder, surgical; with lysis and resection of adhesions, with or without manipulation | 090 |
| 29826 | Arthroscopy, shoulder, surgical; decompression of subacromial space with partial acromioplasty with coracoacromial ligament (i.e., arch) release | ZZZ (add-on procedure billed with primary procedures including, but not necessarily limited to, CPT codes 29806, 29807, 29821, 29822, 29823, 29824, 29825) |
| 29827 | Arthroscopy, shoulder, surgical; with rotator cuff repair | 090 |
| 29840 | Arthroscopy, wrist, diagnostic, with or without synovial biopsy (separate procedure) | 090 |
| 29845 | Arthroscopy, wrist, surgical; synovectomy, complete | 090 |

| CPT Code | Description | FUD |
|---|---|---|
| 29846 | Arthroscopy, wrist, surgical; excision and/or repair of triangular fibrocartilage and/or joint debridement | 090 |
| 29870 | Arthroscopy, knee, diagnostic, with or without synovial biopsy (separate procedure) | 090 |
| 29875 | Arthroscopy, knee, surgical; synovectomy, limited (eg, plica or shelf resection) (separate procedure) | 090 |
| 29876 | Arthroscopy, knee, surgical; synovectomy, major, two or more compartments (eg, medial or lateral) | 090 |
| 29877 | Arthroscopy, knee, surgical; debridement/shaving of articular cartilage (chondroplasty) | 090 |
| 29879 | Arthroscopy, knee, surgical; abrasion arthroplasty (includes chondroplasty where necessary) or multiple drilling or microfracture | 090 |
| 29880 | Arthroscopy, knee, surgical; with meniscectomy (medial AND lateral, including any meniscal shaving) including debridement/shaving of articular cartilage (chondroplasty), same or separate compartment(s), when performed | 090 |
| 29881 | Arthroscopy, knee, surgical; with meniscectomy (medical OR lateral, including any meniscal shaving | 090 |

507.    The office visits for normal post-operative care billed by Dowd under CPT codes

99213 and 99214 often occurred within this ninety (90) day period, as illustrated in the chart below:

| Claimant | Claim No. | Date of Surgery | CPT Code (Office Visit) | Date of Office Visit Under CPT Code 99213/99214 |
|---|---|---|---|---|
| A.P. | 0461777500 | 10/14/2017 | 99213 | 11/29/2017 |
| T.E. | 0500896815 | 8/10/2018 | 99213 | 8/13/2018 |
| R.A. | 0505666115 | 7/23/2018 | 99213 | 7/30/2018 |
| A.A. | 0507396223 | 8/10/2018 | 99213 | 9/6/2018 |
| J.T. | 0404225120 | 6/2/2016 | 99213 | 6/8/2016 |
| M.B. | 0329192686 | 7/7/2014 | 99214 | 8/20/2014 |
| D.M. | 0296875586 | 9/20/2013 | 99213 | 9/25/2013 |
| B.L. | 0416959146 | 10/19/2016 | 99213 | 11/2/2016 |
| B.L. | 0416959146 | 10/19/2016 | 99213 | 12/7/2016 |
| C.J. | 0392722443 | 2/5/2016 | 99213 | 3/3/2016 |
| L.B. | 0392815700 | 1/8/2016 | 99213 | 1/21/2016 |
| M.M. | 0422019745 | 10/27/2016 | 99213 | 11/9/2016 |
| R.C. | 0423846500 | 11/4/2016 | 99213 | 11/18/2016 |
| S.S. | 0428407050 | 11/2/2016 | 99213 | 12/14/2016 |
| S.S. | 0428407050 | 11/2/2016 | 99213 | 1/11/2017 |

508.     Therefore, Dowd was not entitled to reimbursement under the Fee Schedule for follow-up visits within the ninety (90) days following the surgeries because this normal follow-up care was included in the listed value for the surgical procedure.

509.     Rather, such normal post-operative follow-up visits should have been reported under CPT code 99024, which, according to the Fee Schedule, is used for a "[p]ostoperative follow-up visit, normally included in the surgical package, to indicate that an evaluation and management service was performed during a postoperative period for a reason(s) related to the original procedure."

510.     Because Dowd's charges relating to follow-up visits purportedly provided to Allstate claimants were charged in excess of the amount permitted under the Fee Schedule and were purposely misrepresented, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault laws.

511.    To the extent that Allstate paid Dowd in reliance on the documents created and submitted in connection with these services, including those listed in Exhibit 6, Allstate is entitled to recover all payments made to Dowd in connection with these services, including, but not limited to, those payments listed in Exhibit 3.

512.    Moreover, to the extent that any of the charges submitted by Dowd to Allstate in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 6), Allstate is under no obligation to make any payments to Dowd in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault laws.

f.    Improper Billing at Highest Regional Conversion Factor

513.    As stated above, CPT codes are published annually by the AMA to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental healthcare payors.

514.    Reimbursement under the Fee Schedule is a function of the relative value units ("RVU") assigned to the CPT code. The RVU depends on (a) the physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

515.    The amount of the maximum charge permissible under the Fee Schedule is calculated by multiplying the listed RVU by the applicable conversion factor.

516.    There are four (4) categories of conversion factors corresponding to four (4) regions in the State of New York as identified by zip code.

517.    For each of the four (4) regional categories, there is a corresponding conversion factor for certain sections of the Fee Schedule, including the Surgery section.

518.    For example, effective December 1, 2010, the regional conversion factors for Surgery for Regions III and IV is $210.71 and $229.04, respectively.

519.    Dowd consistently bills using the higher conversion factor under the Fee Schedule for Region IV, even if the surgical procedure was performed in a zip code located in Region III.

520.    For example, Allstate claimant B.L. (claim no. 0416959146) underwent arthroscopic shoulder surgery with Dowd on October 19, 2016 at St. Joseph's Medical Center, which is located in Yonkers, New York 10701.

521.    Zip code 10701 is located in Region III under the Fee Schedule.

522.    However, Dowd billed for the services performed on October 19, 2016 using the conversion factor for Region IV.

523.    By way of an example, the chart below illustrates the improper amounts billed by Dowd for B.L.'s October 19, 2016 procedure:

| Date of Procedure | Location of Procedure | CPT Code | RVU | Amount Charged by Dowd | Conversion Factor Used by Dowd |
|---|---|---|---|---|---|
| 10/19/2016 | Yonkers, NY 10701 | 29823 | 8.20 | $1,878.12 | $229.04 |
| 10/19/2016 | Yonkers, NY 10701 | 29825 | 8.18 | $1,874.00 | $229.04 |
| 10/19/2016 | Yonkers, NY 10701 | 29821 | 7.77 | $1,780.00 | $229.04 |
| 10/19/2016 | Yonkers, NY 10701 | 29826 | 1.97 | $451.13 | $229.04 |

524.    As illustrated in the chart above, Dowd improperly billed using the higher conversion factor for Region IV of $229.04 when the charges should have been calculated using the regional conversion factor for Region III of $210.71.

525.    The chart below lists additional representative examples of instances for which Dowd submitted bills that improperly calculated the amounts charged for surgeries performed at

St. Joseph's Medical Center using the regional conversion factor for Region IV rather than Region III.

| Claimant Initials | Claim Number | Date of Procedure | Location of Procedure |
|---|---|---|---|
| A.A. | 0507396223 | 8/10/2018 | Yonkers, NY 10701 |
| S.S. | 0428407050 | 11/2/2016 | Yonkers, NY 10701 |
| I.B. | 0412602070 | 12/14/2016 | Yonkers, NY 10701 |
| T.E. | 0500896815 | 8/10/2018 | Yonkers, NY 10701 |
| D.M. | 0436871156 | 2/22/2017 | Yonkers, NY 10701 |
| E.T. | 0475820882 | 12/29/2017 | Yonkers, NY 10701 |
| E.A. | 0379704157 | 2/17/2016 | Yonkers, NY 10701 |
| R.O. | 0388975799 | 3/16/2016 | Yonkers, NY 10701 |
| O.R. | 0401445200 | 3/30/2016 | Yonkers, NY 10701 |
| W.B. | 0428407050 | 1/4/2017 | Yonkers, NY 10701 |
| R.G. | 0436883565 | 1/11/2017 | Yonkers, NY 10701 |
| I.T. | 0443505128 | 4/19/2017 | Yonkers, NY 10701 |
| R.G. | 0446635328 | 5/17/2017 | Yonkers, NY 10701 |
| J.V. | 0461218638 | 8/23/2017 | Yonkers, NY 10701 |
| R.S. | 0453754533 | 9/20/2017 | Yonkers, NY 10701 |
| J.Q. | 0462184664 | 11/10/2017 | Yonkers, NY 10701 |
| J.W. | 0482031903 | 1/26/2018 | Yonkers, NY 10701 |
| T.S. | 0499435451 | 5/25/2018 | Yonkers, NY 10701 |

526.   By billing for services rendered in Region III as if the services were rendered in Region IV, Dowd intentionally misrepresented and inflated the amounts charged for these surgical procedures.

527.   Because Dowd's charges relating to surgical procedures purportedly provided to Allstate claimants at St. Joseph's Medical Center were charged in excess of the amounts permitted under the Fee Schedule and purposely misrepresented, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault laws.

528.   To the extent that Allstate paid Dowd in reliance on the documents created and submitted to Allstate by Dowd in connection with such unlawfully charged surgical procedures provided to Dowd's patients, Allstate is entitled to recover all payments made to Dowd in

connection with any such procedures, including, but not limited to, those payments listed in Exhibit 3.

529.    Moreover, to the extent that any of the charges submitted by Dowd to Allstate in connection with these procedures remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 2), Allstate is under no obligation to make any payments to Dowd in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault laws.

g.    Fraudulent Billing for Initial Examinations and Consultations

530.    The initial examinations and consultations billed for by Dowd were an essential component to his scheme to defraud Allstate through the performance of premature and medically unnecessary surgical procedures and the dispensing of certain items of DME through his own company following these surgeries.

531.    In most cases, Dowd used these examinations and consultations to justify the performance of—and charges for—premature and medically unnecessary arthroscopic procedures, which Dowd then charged Allstate for even though he was not lawfully entitled to seek or collect payment for these services.

532.    However, Dowd's charges for these services were false and fraudulent because the examinations and consultations were always perfunctory and lacking the necessary substance to bill at high level CPT codes.

533.    Providers must correctly identify the procedure performed when seeking payment under New York's No-Fault laws.

534.     Generally, the Fee Schedule's reimbursement rates are determined by considering the (a) physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

535.     Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of the CPT code billed, the greater amount of reimbursement).

536.     Billing a service at a higher level CPT code than actually performed, for the purpose of receiving greater reimbursement, is an example of a fraudulent billing practice and such charges are not compensable.

537.     The invoices submitted to Allstate by Dowd included CPT codes for initial examinations and consultations that were not performed consistently with the AMA's CPT requirements.

538.     By creating, or causing the creation of, medical bills that included CPT codes, then causing such invoices to be submitted to Allstate, Dowd represented to Allstate that the invoiced medical services were performed in conformity with the AMA's CPT guidelines.

539.     However, many of the bills prepared and submitted by Dowd contained improper and/or intentionally deceptive CPT codes.

540.     In some cases, in reasonable reliance on the documentation submitted by Dowd, Allstate made payments to Dowd for said medical services.

541.     In other cases, Dowd has submitted invoices demanding payment for such services, and such invoices remain unpaid or have been denied by Allstate.

542.     For the reasons explained below, none of these initial examinations and consultations were compensable under New York's No-Fault law as represented by Dowd.

*i.*      *Initial Examinations/Office Visits*

543.    Dowd billed for initial patient examinations at high-level codes, including CPT code 99204.

544.    However, these charges were false and fraudulent because by using these CPT codes, Dowd made several misrepresentations about the nature and extent of these examinations and evaluations.

545.    For example, any charges for examinations submitted under CPT code 99204 must meet the criteria listed below:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99201 | Problem Focused | Problem Focused | Straight forward | 10 minutes |
| 99202 | Expanded Problem Focused | Expanded Problem Focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

546.    Therefore, a charge for an examination classified under CPT code 99204 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, and (c) medical decision making of moderate complexity.

547.    If any of the three (3) key components are not met, CPT code 99204 is not supported.

548.    In the case of such patient examinations, the factors considered to determine the "complexity" of medical decision making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99201 and 99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99204) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99205) | Extensive | Extensive | High |

549.    To qualify for a given type of decision making, two (2) of the three (3) elements in the table must be met or exceeded.

550.    The presenting problem(s) warranting CPT code 99204 are also usually of moderate severity.

551.    Additionally, physicians typically spend forty-five (45) minutes of face-to-face time with the patient and/or family when billing under CPT code 99204.

552.    Because Dowd's examinations were actually minimal and insubstantial, his representations about the nature and extent of the services were false, and the charges based on these misrepresentations were likewise false.

553.    Indeed, several claimants testified that Dowd did not spend anywhere near forty-five (45) minutes of face-to-face time with the claimant during the initial examination.

554.    For instance, Dowd examined Allstate claimant E.E. (claim no. 0387317456), on November 12, 2015, and then submitted charges to Allstate for this office visit under CPT code 99204.

555.    Dowd examined E.E. at a clinic located at 2184 Flatbush Avenue, Brooklyn, New York based upon the referral of another doctor who worked at the clinic.

556.    According to E.E., the office visit with Dowd lasted "[f]or 15, 20 minutes."

557.    Dowd told E.E. that the surgery would be scheduled and performed and that E.E. needed surgery because, according to Dowd, surgery was the only way that E.E.'s shoulder injury would go away.

558.    E.E.'s testimony about the nature and extent of the office visit demonstrates why Dowd's charge under CPT code 99204 was false whereas the exam was brief (less than half the required time) and not complex (Dowd conducted a cursory exam and then simply told E.E. that he was performing surgery).

559.    Another claimant, M.W. (claim no. 0487033946), testified that she met with Dowd at a clinic located at 318 Seguine Avenue, Staten Island, New York.

560.    According to M.W., Dowd's examination lasted only "ten, fifteen minutes."

561.    Consistent with M.W.'s statement, Dowd's examination report for the February 16, 2018 office visit supports the cursory nature of the examination by providing only a brief four (4) sentence summary of M.W.'s present condition.

562.    Notably, Dowd's examination report shows that M.W. did not report any past medical history, allergies, or medications for Dowd's consideration.

563.    Dowd simply concluded the exam by making only two (2) diagnoses, including one "possible" diagnosis.

564.    Despite conducting a brief and minimal examination of M.W., Dowd submitted charges to Allstate for this office visit under CPT code 99204.

565.    M.W.'s testimony about the nature and extent of the February 16, 2018 office visit demonstrates why Dowd's charge under CPT code 99204 was false whereas the examination was brief (less than half the required time) and not complex in terms of medical decision making (Dowd did not document any complex data to be reviewed and then proceeded to make only a minimal—and partially uncertain—diagnosis).

566.    Additionally, Dowd examined Allstate claimant T.S. (claim no. 0477973119) on November 7, 2017, and then submitted charges to Allstate for this office visit under CPT code 99204.

567.    According to T.S., Dowd examined T.S. at the clinic located at 135-25F 79th Street, Howard Beach, New York very briefly and he did not ask her any questions.

568.    Consistent with T.S.'s description of Dowd's cursory examination, Dowd's examination report for this office visit documented no past medical history, allergies, or medications for T.S. and focused on her complaints of bilateral shoulder and knee pain.

569.    Dowd simply concluded the examination by making only two (2) "possible" diagnoses of internal derangement of the shoulders and right knee.

570.    Even though Dowd's examination of T.S. was exceedingly brief and lacked necessary complexity, Dowd submitted charges to Allstate for this office visit under CPT code 99204.

571.    T.S.'s testimony about the nature and extent of the November 7, 2017 office visit demonstrates why Dowd's charge under CPT code 99204 was false whereas the examination was extremely brief and not complex in terms of scope of medical decision making (Dowd did not

document any complex data to be reviewed or, according to T.S., ask her any questions, and then

he proceeded to purport to diagnose T.S. with minimal—and uncertain—diagnoses).

572.    Therefore, for these claimants, Dowd's examinations did not support billing under

CPT code 99204 as the examinations did not include face-to-face time of forty-five (45) minutes,

a comprehensive history, or a comprehensive examination.

573.    Accordingly, for these reasons, all of Dowd's charges for such services are not

compensable as represented.

574.    Indeed, the records submitted by Dowd regarding these office visits rather support

billing under either CPT code 99201 (for an examination with (a) a problem focused history, (b) a

problem focused examination, and (c) straightforward medical decision making) or CPT code

99202 (for an examination with (a) an expanded problem focused history, (b) an expanded problem

focused examination, or (c) low complexity of medical decision making).

575.    For instance, the chart below illustrates representative examples of the inflated

amounts billed by Dowd for office visits that were not represented as performed:

| Claimant | Claim Number | Date of Exam | Purported Place of Exam | Amount Billed Under CPT Code 99204 | CPT Code Supported by the Record | Amount Actually Permitted Under the Fee Schedule |
|---|---|---|---|---|---|---|
| B.L. | 0416959146 | 7/27/2016 | South Setauket, NY 11720 | $180.00 | 99201 | $64.07 |
| C.J. | 0392722443 | 1/7/2016 | South Setauket, NY 11720 | $180.00 | 99201 | $64.07 |
| L.B. | 0392815700 | 12/21/2015 | Glendale, NY 11385 | $148.69 | 99202 | $79.90 |
| J.T. | 0404225120 | 5/25/2016 | Glendale, NY 11385 | $148.69 | 99202 | $79.90 |
| M.M. | 0422019745 | 10/13/2016 | Glendale, NY 11385 | $148.69 | 99201 | $64.07 |

| Claimant | Claim Number | Date of Exam | Purported Place of Exam | Amount Billed Under CPT Code 99204 | CPT Code Supported by the Record | Amount Actually Permitted Under the Fee Schedule |
|---|---|---|---|---|---|---|
| R.C. | 0423846500 | 10/21/2016 | Port Jefferson, NY 11777 | $148.69 | 99201 | $64.07 |
| S.S. | 0428407050 | 10/26/2016 | Yonkers, NY 10701 | $148.69 | 99202 | $73.50 |
| E.E. | 0387317456 | 11/12/2015 | Glendale, NY 11385 | $148.69 | 99202 | $79.90 |

576.     During the relevant period, Dowd submitted and/or caused to be submitted, claims to Allstate based on these records.

577.     The chart annexed at Exhibit 7 identifies all of Dowd's patients that purportedly received initial examinations/office visits that were billed at the CPT code 99204 level.

578.     Based on the medical documentation submitted by Dowd for each of the patients identified in Exhibit 7, none of the billing containing charges for CPT code 99204 was warranted because the medical documentation submitted to Allstate by the defendants for each of the patients fails to meet the minimum threshold necessary to bill CPT code 99204.

579.     Because the nature and extent of the examinations purportedly provided to the patients identified in the chart annexed at Exhibit 7 were misrepresented, Dowd is not entitled to collect payment for such services under New York's No-Fault laws.

580.     To the extent that Allstate paid Dowd in reliance on the documents created and submitted in connection with these initial examinations/office visits, including, but not necessarily limited to, those services listed in Exhibit 7, Allstate is entitled to recover all payments made to Dowd in connection with these misrepresented services, including, but not limited to, those payments listed in Exhibit 3.

581.    Moreover, to the extent that any of the charges itemized in Exhibit 7 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by Dowd in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

ii.    _Initial Consultations_

582.    During the relevant period, Dowd routinely billed for initial consultations under high level CPT code 99244.

583.    However, Dowd's use of CPT code 99244 when charging Allstate for these consultations deliberately misrepresented the nature and extent of the services actually rendered.

584.    The criteria used to assign the correct CPT code to an initial patient consultation includes consideration of the following components:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99241 | Problem Focused | Problem Focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

585.    Thus, a provider may only charge for consultations under CPT code 99244 if they include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "moderate complexity," and (d) face-to-face time of either sixty (60) or eighty (80) minutes.

586.    The presenting problems warranting CPT code 99244 usually are of moderate to high severity.

587.    The factors considered to determine the "complexity" of medical decision making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99241-99242) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT 99243) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99244) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99245) | Extensive | Extensive | High |

588.    As with examinations, to qualify for a given type of decision making when charging for consultations, providers must meet or exceed two (2) of the three (3) elements in the table set forth above.

589.    Because Dowd's consultations were actually cursory and insubstantial, Dowd's representations about the nature and extent of the services were false, and the charges based on these representations were likewise false.

590.    The chart annexed at Exhibit 8 identifies all of Dowd's patients that purportedly received consultations that were billed at the CPT code 99244 level.

591.    Based upon the medical documentation submitted by Dowd for each of the patients identified in Exhibit 8, none of the billing containing charges for CPT code 99244 was warranted,

whereas Dowd's medical documentation for each of the patients fails to meet the minimum threshold necessary to bill CPT code 99244.

592.    Dowd failed to document the necessary history and examination required by CPT code 99244.

593.    For instance, Dowd conducted an initial consultation of Allstate claimant B.N. (claim no. 0297191116) on September 11, 2013 at which B.N. complained of injuries to his right shoulder, neck, and back.

594.    Notably, Dowd's examination report shows that B.N. did not have any medical history, allergies, or medications that necessitated further discussion and consideration by Dowd at the consultation.

595.    Dowd's consultation report indicates that his examination of B.N. was limited to B.N.'s presenting issues regarding the right shoulder, neck, and back.

596.    Dowd concluded his examination report by diagnosing B.N. with cervical sprain, lumbar sprain, and right shoulder impingement syndrome.

597.    Therefore, Dowd's examination report for B.N.'s September 11, 2013 consultation demonstrates why Dowd's charge under CPT code 99244 was false whereas Dowd's straightforward and problem-focused examination of B.N. was not accompanied by a comprehensive history, a comprehensive examination, or a moderate amount or complexity of data to be reviewed to warrant use of this high-level code.

598.    Dowd conducted an initial consultation of Allstate claimant P.G. (claim no. 0331726737) on August 8, 2014 for complaints of right shoulder pain following a motor vehicle accident on June 17, 2014.

599.    Dowd's report of this consultation for P.G. does not identify any past medical history, past surgical history, or allergies.

600.    Further, following a brief description of his physical examination of P.G.'s right shoulder, Dowd's report includes a diagnosis limited to only right shoulder derangement with rotator cuff tear.

601.    Therefore, Dowd's report for P.G.'s August 8, 2014 consultation demonstrates that Dowd falsely submitted charges to Allstate under CPT code 99244 for a straight-forward and problem-focused consultation whereas Dowd's report does not reflect a sufficiently comprehensive examination with moderate complexity of medical decision making including multiple diagnoses (Dowd made just one diagnosis for P.G.) or a moderate amount or complexity of data to be reviewed (Dowd did not identify any past medical history, past surgical history, or allergies for P.G.) to justify use of such a high-level code.

602.    Dowd also performed an initial consultation for Allstate claimant C.M. (claim no. 0337860621) on September 17, 2014 for C.M.'s injuries to his knees, shoulders, and lower back following a motor vehicle accident.

603.    Dowd's report for this September 17, 2014 consultation identified no past medical history, no allergies, and no medications for C.M. requiring Dowd's consideration.

604.    Following a brief description of his physical examination of C.M.'s shoulders and knees, Dowd reported diagnoses of bilateral knee internal derangements greater in the left knee and bilateral shoulder contusions with possible internal derangements.

605.    Nonetheless, Dowd falsely billed for C.M.'s September 17, 2014 consultation under CPT code 99244 even though Dowd's initial consultation report for the September 17, 2014

consultation simply does not reflect the comprehensiveness of exam and severity of the presenting problem necessary to warrant billing under CPT code 99244.

606.     Indeed, Dowd's report for the September 17, 2014 initial consultation of C.M. actually depicts a straightforward and problem-focused examination that did not warrant a charge under CPT code 99244 because this consultation did not include a comprehensive history, a comprehensive examination, a moderate amount or complexity of data to be reviewed, and a moderate risk of complications to warrant use of this high-level code.

607.     Accordingly, for these reasons, all of Dowd's charges for such services are not compensable as represented.

608.     Indeed, the records submitted by Dowd regarding these office visits would be more accurately represented through CPT codes with much less stringent requirements, including CPT code 99241, the requirements of which include (a) a problem focused history, (b) a problem focused examination, and (c) straightforward medical decision making.

609.     During the relevant period, Dowd submitted, and/or caused to be submitted, claims to Allstate based on these records.

610.     Because the nature and extent of the consultations purportedly provided to the patients identified in the chart annexed at Exhibit 8 were misrepresented, Dowd is not entitled to collect payment for such services under New York's No-Fault laws.

611.     To the extent that Allstate paid Dowd in reliance on the documents created and submitted in connection with these consultations, including, but not necessarily limited to, those services listed in Exhibit 8, Allstate is entitled to recover payments made to Dowd in connection with the consultations, including, but not limited to, those payments listed in Exhibit 3.

612.     Moreover, to the extent that any of the charges itemized in Exhibit 8 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by Dowd in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

**D.     TRIBOROUGH ORTHOPEDICS' HIGH PROFITS FROM CPM AND CTU RENTALS**

613.     Dowd's unlawful self-referrals to Triborough Orthopedics for the dispensing of CPM and CTU devices were motivated by the substantial profits that could be realized through the rental of unnecessary CPM and CTU devices in connection with his surgery patients.

614.     As illustrated in the chart attached as Exhibit 4, Triborough Orthopedics routinely billed Allstate under Healthcare Common Procedure Coding System (HCPCS) codes E0935 for CPM devices for the knee only, E0936 for CPM devices for use other than the knee, and E0236 for a pump for a water circulating pad.

615.     Triborough Orthopedics owns the CPM and CTU devices, and when Dowd prescribes these devices to his surgery patients, Triborough Orthopedics provides the devices to patients on a rental basis and then charges Allstate for the rental fees.

616.     Triborough Orthopedics charges Allstate a daily rate for the rental of the CPM and CTU devices.

617.     For the CPM device designed for the knee (E0935), Triborough Orthopedics charged Allstate a rental rate of $75 per day.

618.     Because Dowd typically orders the use of CPM devices for forty-two (42) days, Triborough Orthopedics was able to charge Allstate a total of $3,150 for the rental of each CPM device for the knee.

619. According to Triborough Orthopedics' own records, it pays $3,825.00 to purchase each knee CPM device (a Spectra knee CPM).

620. Dowd's motivation for prescribing these devices to many of his surgery patients is clear—given the acquisition costs, Dowd, through Triborough Orthopedics, is able to recoup the entire purchase price (and more) through the first two (2) prescriptions, thus allowing him to reap pure profit from every subsequent prescription.

621. Indeed, the amounts that Triborough Orthopedics charges to Allstate for the rental of CPM devices for the knee are grossly excessive when compared to the amounts for which similar devices could be rented by members of the general public.

622. For instance, a comparable CPM device for the knee is available for a six (6)-week rental to the general public at rates ranging from $775 ($18.45 per day) to $998 ($23.76 per day).

623. In contrast, Triborough Orthopedics charged Allstate for CPM devices for the knee at a rate of $3,150 ($75 per day), which represents a substantial mark-up of more than $2,000 per device over and above the amounts at which a similar device is available for rental for a six (6)-week time period by the general public.

624. For the CPM device designed for the shoulder (E0936), Triborough Orthopedics charged Allstate a rental rate of $85 per day.

625. Because Dowd typically orders the use of these shoulder CPM devices for forty-two (42) days, Triborough Orthopedics was able to charge Allstate a total of $3,570 for the rental of each shoulder CPM device.

626. According to Triborough Orthopedics' own records, it pays $5,200 to purchase each device (an OptiFlex shoulder CPM).

627.    As with the knee CPM devices, Dowd, through Triborough Orthopedics, is able to recoup the entire purchase price (and more) after only two (2) prescriptions thus allowing Dowd to reap pure profit from every subsequent prescription.

628.    Indeed, the amounts that Triborough Orthopedics charges to Allstate for the rental of shoulder CPM devices are grossly excessive when compared to the amounts for which similar devices could be rented by members of the general public.

629.    For instance, a comparable shoulder CPM device is available for a six (6)-week rental to the general public at a rate of $1,275 ($30.36 per day).

630.     In contrast, Triborough Orthopedics charged Allstate for shoulder CPM devices at a rate of $3,570 ($85 per day), which represents a substantial mark-up of more than $2,000 per device over and above the amounts at which a similar device is available for rental for a six (6)-week time period to the general public.

631.    For the CTU devices (E0236) given to patients for post-surgery icing, Triborough Orthopedics charged Allstate a rental rate of $21 per day.

632.    Dowd always ordered that the patients use the CTU devices for fourteen (14) days, which allowed Triborough Orthopedics to bill Allstate a total of $294 for each CTU rental.

633.    According to Triborough Orthopedics' own documents, it typically pays $450 to purchase each CTU device.

634.    Just like the CPM devices, Dowd, through Triborough Orthopedics, is able to recoup the entire purchase price of the CTU device (and more) after only two (2) prescriptions, thus giving Dowd yet another way to reap substantial profits from his prescription of these largely unnecessary and overly costly devices.

635. Overall, the profits derived from Dowd's unnecessary and excessive DME prescriptions, and Triborough Orthopedics' fulfillment of those prescriptions—prescriptions that were the product of unlawful self-referrals—helped fuel the success of this scheme.

636. The defendants further profited from their DME scheme by charging Allstate for the delivery of the devices to the claimants' homes.

637. In addition to dispensing and charging for the DME that had been prescribed by Dowd, Triborough Orthopedics also charged Allstate $200 for the delivery of post-operative rehabilitation equipment to the residence of the patient.

638. The delivery services were billed under CPT code E1399, which is a code reserved for miscellaneous DME.

639. However, under 12 N.Y.C.R.R. § 442.2(c), which section governs the Fee Schedule for durable medical goods, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery."

640. Therefore, Triborough Orthopedics' delivery fee charges are unlawful, and Allstate has no legal obligation to pay Triborough Orthopedics for these services.

## VI. SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

641. Throughout the course of this scheme, Dowd and Triborough Orthopedics, along with other persons working at their direction and/or on their behalf, created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the law of the United States by devising, and intending to devise, schemes

to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

642.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

643.    Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

## A.    TRIBOROUGH ORTHOPEDICS ENTERPRISE

644.    Dowd (and/or other persons working at Dowd's direction and/or on Dowd's behalf) either personally used the U.S. Mail to further this fraudulent scheme by causing Triborough Orthopedics' invoices and other claim submission documents to be mailed to Allstate and/or the claimants or their counsel, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

645.    Dowd (and/or other persons working at Dowd's direction and/or on Dowd's behalf) caused Triborough Orthopedics to falsely certify that it was, in all respects, eligible to be

reimbursed under New York's No-Fault laws each time that Triborough Orthopedics mailed demands for payment (i.e., invoices) or other claim submission documents to Allstate.

646.     During the entire course of this scheme, Triborough Orthopedics was completely ineligible for No-Fault reimbursement under New York law because the services that it provided to Allstate claimants were the product of unlawful self-referrals between Dowd and Triborough Orthopedics.

647.     Triborough Orthopedics was also completely ineligible for No-Fault reimbursement under New York law because the devices were unwarranted, unneeded, and not medically necessary, and because Triborough Orthopedics' delivery charges relating to this unnecessary DME were also not compensable.

648.     Therefore, because (a) Triborough Orthopedics was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Dowd (and/or other persons working at Dowd's direction and/or on Dowd's behalf) caused Triborough Orthopedics to seek No-Fault reimbursement from Allstate (even through Triborough Orthopedics was not entitled to such reimbursement), and (c) Triborough Orthopedics used the U.S. Mail to seek reimbursement, it is clear that Dowd committed mail fraud.

649.     At all relevant times, Dowd knew that Triborough Orthopedics, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Triborough Orthopedics.

650.     Allstate estimates that the unlawful operation of the Triborough Orthopedics enterprise generated hundreds of mailings. A table highlighting selected examples of mailings

made in furtherance of this scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

## VII. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS REGARDING THE DEFENDANTS' NO-FAULT REIMBURSEMENT ELIGIBILITY

651.    At all relevant times, Dowd purposely and falsely certified that he and his company Triborough Orthopedics, were, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to surgical procedures, durable medical equipment, and other healthcare services purportedly provided to Allstate claimants.

652.    Indeed, Dowd attested (or caused the attestation) to the medical necessity of the services and/or equipment that he (or persons under his direction and control) allegedly performed and/or provided in connection with Dowd's patients, as well as the validity of the charges for such services.

653.    Because Dowd was responsible for (a) charging Allstate for healthcare services that were not rendered as represented, (b) performing, and submitting (or causing the submission of) charges for, premature and/or medically unnecessary surgical procedures, (c) performing, and submitting (or causing the submission of) charges for, surgical procedures that were not causally related to the underlying accident, (d) prescribing certain items of medically unnecessary durable medical equipment to be dispensed by his own company, Triborough Orthopedics, without lawfully disclosing his ownership interest in Triborough Orthopedics to Dowd's patients, (e) preparing, and submitting (or causing the submission of), letters of medical necessity and/or rebuttals to Allstate in support of the charges for premature and/or medically unnecessary surgical procedures and post-operative durable medical equipment purportedly dispensed by Triborough

Orthopedics, and (f) submitting (or causing the submission of) charges to Allstate for surgical procedures, durable medical equipment, and/or other healthcare services in violation of the applicable Fee Schedule, Dowd and/or Triborough Orthopedics falsely claimed eligibility for No-Fault reimbursement each and every time that the defendants sought No-Fault reimbursement from Allstate.

654.    As alleged above, Dowd (or those persons working under his control) created and submitted to Allstate No-Fault claim reimbursement documents and demands for payment relative to surgical procedures, durable medical equipment, and other healthcare services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) premature, (e) not causally related to the underlying accident, (f) falsely charged, and/or (g) not actually provided as represented.

655.    Such conduct is unlawful, and rendered each claim non-compensable under New York's No-Fault laws.

656.    Many of the false, fraudulent, and unlawful acts are not readily evidenced within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

657.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

658.    Thus, every time that Dowd (along with individuals working under his control) submitted, or caused Triborough Orthopedics to submit, No-Fault reimbursement demands to Allstate, Dowd (and those individuals working under his control) necessarily certified that he

and/or Triborough Orthopedics was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

659.    Dowd's purposeful concealment of his and Triborough Orthopedics' lack of eligibility for No-Fault reimbursement allowed the scheme to continue undetected.

660.    Specifically, Dowd undertook steps to prevent detection of his scheme by, among other things, (a) misrepresenting the actual location where he provided services to his patients in medical documentation and bills submitted to Allstate, (b) failing to provide complete responses to Allstate's requests for documents, including requests for copies of agreements that Dowd entered into for the purchase, lease, sublease, licensing, or rental of office space, despite the known existence of at least one such agreement, and (c) submitting letters of medical necessity and rebuttals to Allstate on behalf of himself and Triborough Orthopedics falsely attesting to the medical necessity of the services provided to Allstate insureds, as well as the propriety of the amounts charged therefor.

661.    Therefore, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Dowd's and Triborough Orthopedics' material misrepresentations to Allstate.

662.    Consequently, the full extent of Dowd's and Triborough Orthopedics' fraudulent and unlawful acts was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.    ALLSTATE'S JUSTIFIABLE RELIANCE

663.    Each claim submitted to Allstate by or on behalf of Dowd and Triborough Orthopedics was verified pursuant to Insurance Law § 403.

664.    At all relevant times, Dowd, as a licensed physician, was legally and ethically obligated to act with honesty and integrity in connection with his provision of, and billing for, healthcare services.

665.    To induce Allstate to promptly pay Dowd's and Triborough Orthopedics' invoices for services rendered or DME provided to patients, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms, HCFA-1500 forms, or CMS-1500 forms certifying that Dowd and Triborough Orthopedics were eligible to be reimbursed under New York's No-Fault laws.

666.    Further, to induce Allstate to promptly pay the non-compensable charges for the evaluations, surgeries, DME, and other professional healthcare services purportedly provided to patients of Dowd and Triborough Orthopedics, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Dowd's and Triborough Orthopedics' invoices are not promptly paid in full.

667.    Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

668.    At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Dowd's and Triborough Orthopedics' reimbursement eligibility under New York's No-Fault laws.

669. Acting in reasonable reliance on these misrepresentations, Allstate was induced to make payment to Dowd and Triborough Orthopedics to its detriment—payments that were funded with the No-Fault insurance benefits that were available to each Allstate claimant.

670. Allstate would not have made any of these payments to Dowd and Triborough Orthopedics had the defendants provided true and accurate information about Dowd's and Triborough Orthopedics' reimbursement eligibility under New York's No-Fault laws, including the necessity of the evaluations, surgeries, DME, and other professional healthcare services purportedly provided to patients of Dowd and Triborough Orthopedics.

671. As a result of the defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the defendants' false healthcare documentation and false representations regarding the defendants' eligibility for reimbursement under New York's No-Fault laws.

672. Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## IX.    DAMAGES

673. The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made by Allstate to Dowd and Triborough Orthopedics in connection with claims made under New York's No-Fault laws, the exact amount to be determined at trial, including:

(a) Payments made to Dowd totaling at least $985,094.00, the exact amount to be determined at trial. The chart at Exhibit 3 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Dowd in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(b) Payments made to Triborough Orthopedics, P.C. totaling at least $269,175.00, the exact amount to be determined at trial. The chart as Exhibit 5 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Triborough Orthopedics, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### TRIBOROUGH ORTHOPEDICS, P.C.
### (Against Andrew J. Dowd, M.D.)

674.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

675.    Triborough Orthopedics, P.C. ("Triborough Orthopedics") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

676.    Defendant Andrew J. Dowd, M.D. ("Dowd" or "Count I Defendant") participated in the operation and management of the Triborough Orthopedics enterprise during the course of this scheme, and, in connection with each of the claims identified in or subject to plaintiffs' Complaint, intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Triborough Orthopedics' business, or should have reasonably foreseen that the mailing of such false medical documentation by Triborough Orthopedics would occur, in furtherance of the scheme to defraud.

677. The Count I Defendant employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

678. Among other things, NF-3 forms, HCFA-1500 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

679. Policies of insurance were delivered to insureds through the U.S. Mail.

680. Payments to Triborough Orthopedics traveled through the U.S. Mail.

681. As documented above, the Count I Defendant repeatedly and intentionally submitted NF-3 forms, HCFA-1500 forms, and/or CMS-1500 forms and other medical documentation to Allstate for items of durable medical equipment and related services that were purportedly provided by Triborough Orthopedics, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

682. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Triborough Orthopedics for the benefit of the Count I Defendant that it would not otherwise have paid.

683. The Count I Defendant's pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the scheme to continue without being detected.

684. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

685.   By mailing numerous fraudulent claims in an ongoing scheme, the Count I Defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

686.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Triborough Orthopedics for the benefit of the Count I Defendant.

687.   The Count I Defendant participated in the conduct of the Triborough Orthopedics enterprise through a pattern of racketeering activities.

688.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendant's conduct.

689.   The Count I Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

690.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

691.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

692.   By virtue of the Count I Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## COMMON-LAW FRAUD
### (Against Andrew J. Dowd, M.D.)

693.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

105

694.    Defendant Andrew J. Dowd, M.D. ("Count II Defendant") intentionally defrauded Allstate through his submission of charges for surgical procedures and other services that were medically unnecessary, premature, not causally related to the underlying motor vehicle accident, falsely charged, and/or not rendered as represented.

695.    The Count II Defendant's scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Andrew J. Dowd, M.D. was entitled to receive No-Fault reimbursement under New York law.

696.    These misrepresentations of fact by the Count II Defendant included, but were not limited to, the material misrepresentations of fact made in the Count II Defendant's reports, invoices, and collection documentation.

697.    The Count II Defendant's representations were false or required disclosure of additional facts to render the information furnished not misleading.

698.    These misrepresentations were intentionally made by the Count II Defendant in furtherance of his scheme to defraud Allstate by submitting claims for payment of No-Fault insurance benefits.

699.    The Count II Defendant's misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

700.    Allstate reasonably relied, to its detriment, upon the Count II Defendant's material misrepresentations concerning Andrew J. Dowd, M.D.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

701.     Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to the Count II Defendant totaling at least $985,094.00 for which the Count II Defendant was not eligible to receive under New York's No-Fault laws.

### COUNT III
### COMMON-LAW FRAUD
**(Against Triborough Orthopedics, P.C. and Andrew J. Dowd, M.D.)**

702.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

703.     Defendants Triborough Orthopedics, P.C. and Andrew J. Dowd, M.D. (collectively, "Count III Defendants") did conspire to defraud Allstate through the unlawful self-referrals of Andrew J. Dowd, M.D.'s patients to Triborough Orthopedics, P.C. for the provision of items of medically unnecessary durable medical equipment.

704.     The defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Triborough Orthopedics, P.C. was entitled to receive No-Fault reimbursement under New York law.

705.     These misrepresentations of fact by the Count III Defendants included, but were not limited to, the material misrepresentations of fact made in the Count III Defendants' reports, invoices, and collection documentation.

706.     The Count III Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

707.     These misrepresentations were intentionally made by the Count III Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Triborough Orthopedics, P.C. for payment of No-Fault insurance benefits.

708.    The Count III Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

709.    Allstate reasonably relied, to its detriment, upon the Count III Defendants' material misrepresentations concerning Triborough Orthopedics, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

710.    Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to, or for the benefit of, the Count III Defendants totaling at least $269,175.00 for which the Count III Defendants were not eligible to receive under New York's No-Fault laws.

## COUNT IV
## UNJUST ENRICHMENT
### (Against Andrew J. Dowd, M.D.)

711.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

712.    As alleged herein, Defendant Andrew J. Dowd, M.D. ("Count IV Defendant") induced Allstate to make numerous and substantial payments to Andrew J. Dowd, M.D. pursuant to New York's No-Fault laws.

713.    As alleged herein, the Count IV Defendant was never eligible for reimbursement under New York's No-Fault laws because, during the relevant treatment period, Andrew J. Dowd, M.D. submitted charges to Allstate for surgical procedures and other services that were medically unnecessary, premature, not causally related to the underlying motor vehicle accident, falsely charged, and/or not rendered as represented.

714.    When Allstate paid Andrew J. Dowd, M.D., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count IV Defendant, or those persons working under his control, made concerning Andrew J. Dowd, M.D.'s reimbursement eligibility under New York's No-Fault laws.

715.    Each and every No-Fault reimbursement payment that Allstate was caused to make to Andrew J. Dowd, M.D. during the course of the scheme constitutes a benefit that the Count IV Defendant aggressively sought and voluntarily accepted.

716.    Throughout the course of his scheme, Andrew J. Dowd, M.D. wrongfully obtained from Allstate No-Fault benefit payments totaling at least $985,094.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Andrew J. Dowd, M.D.

717.    Retention of those benefits by the Count IV Defendant would violate fundamental principles of justice, equity, and good conscience.

**COUNT V**
**UNJUST ENRICHMENT**
**(Against Triborough Orthopedics, P.C. and Andrew J. Dowd, M.D.)**

718.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

719.    As alleged herein, Defendants Triborough Orthopedics, P.C. and Andrew J. Dowd, M.D. (collectively, "Count V Defendants") conspired to induce Allstate to make numerous and substantial payments to Triborough Orthopedics, P.C. pursuant to New York's No-Fault laws.

720.    As alleged herein, Triborough Orthopedics, P.C. was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Triborough

Orthopedics, P.C. submitted to Allstate charges for items of medically unnecessary durable medical equipment, and other falsely charged services, pursuant to unlawful self-referrals from Triborough Orthopedics, P.C.'s sole owner, Andrew J. Dowd, M.D.

721.    When Allstate paid Triborough Orthopedics, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count V Defendants, or those persons working under their control, made concerning Triborough Orthopedics, P.C.'s reimbursement eligibility under New York's No-Fault laws.

722.    Each and every No-Fault reimbursement payment that Allstate was caused to make to Triborough Orthopedics, P.C. during the course of the scheme constitutes a benefit that the Count V Defendants aggressively caused Triborough Orthopedics, P.C. to seek and voluntarily accept.

723.    Throughout the course of their scheme, the Count V Defendants caused Triborough Orthopedics, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $269,175.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

724.    Throughout the duration of this scheme, the Count V Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Triborough Orthopedics, P.C.

725.    Retention of those benefits by the Count V Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT VI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Andrew J. Dowd, M.D.)

726.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

727.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

728.    In view of Andrew J. Dowd, M.D.'s (a) billing for healthcare services that were not rendered as represented, (b) billing for premature and/or medically unnecessary surgical procedures, (c) billing for surgical procedures for injuries that were not causally related to the underlying motor vehicle accident, and (d) submitting charges for surgical procedures and other healthcare services in violation of the applicable Fee Schedule, Andrew J. Dowd, M.D. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirement necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law and New York Education Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

729.    Andrew J. Dowd, M.D. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

730.    Andrew J. Dowd, M.D. continues to challenge Allstate's prior claim denials.

731.    Andrew J. Dowd, M.D. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

732.    A justifiable controversy exists between Allstate and Andrew J. Dowd, M.D. because Andrew J. Dowd, M.D. rejects Allstate's ability to deny such claims.

733.     Allstate has no adequate remedy at law.

734.     Andrew J. Dowd, M.D. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that his activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Andrew J. Dowd, M.D.

735.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Andrew J. Dowd, M.D., at all relevant times, (a) engaged in the billing for healthcare services not rendered as represented, (b) engaged in the billing for premature and/or medically unnecessary surgical procedures, (c) engaged in the billing for surgical procedures that were not causally related to the underlying motor vehicle accident, and (d) submitted charges for surgical procedures and other healthcare services in violation of the applicable Fee Schedule, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT VII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Triborough Orthopedics, P.C.)**

736.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-673 as if set forth fully herein.

737.     To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

738.     Triborough Orthopedics, P.C. failed to properly disclose its financial relationship with its sole owner, officer, and shareholder, Andrew J. Dowd, M.D., to its patients pursuant to New York Public Health Law § 238-d.

739.    In view of its (a) purported dispensing of medically unnecessary items of durable medical equipment pursuant to improper self-referrals from Andrew J. Dowd, M.D. in violation of New York Public Health Law § 238-d, and (b) submission of excessive charges, Triborough Orthopedics, P.C., was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned benefits under New York's No-Fault Law for durable medical equipment purportedly dispensed pursuant to prescriptions from Andrew J. Dowd, M.D.

740.    Triborough Orthopedics, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

741.    Triborough Orthopedics, P.C. continues to challenge Allstate's prior claim denials.

742.    Triborough Orthopedics, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

743.    A justifiable controversy exists between Allstate and Triborough Orthopedics, P.C. because Triborough Orthopedics, P.C. rejects Allstate's ability to deny such claims.

744.    Allstate has no adequate remedy at law.

745.    Triborough Orthopedics, P.C. will also continue to bill Allstate for No-Fault benefits payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Triborough Orthopedics, P.C.

746.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. §§ 2201 and 2202, declaring that Triborough Orthopedics, P.C., at all relevant times, (a) violated New York Public Health Law § 238-d when it purportedly dispensed, and submitted charges for, medically unnecessary items of durable medical equipment pursuant to

113

improper self-referrals from its sole owner, officer, and shareholder, Andrew J. Dowd, M.D., and (b) submitted excessive charges to Allstate, and thus has no standing to submit or receive assigned No-Fault benefits under New York No-Fault Law.

**XI.    DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" or "plaintiffs"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**TRIBOROUGH ORTHOPEDICS, P.C. ENTERPRISE**
**(Against Andrew J. Dowd, M.D.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in this Complaint; and

(d)  GRANT all other relief this Court deems just.

**COUNT II**
**COMMON-LAW FRAUD**
**(Against Andrew J. Dowd, M.D.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendant's illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault collection suits filed by defendant seeking payment of false and fraudulent invoices; and

114

(d) GRANT all other relief this Court deems just.

### COUNT III
### COMMON LAW FRAUD
### (Against Triborough Orthopedics, P.C. and Andrew J. Dowd, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

### COUNT IV
### UNJUST ENRICHMENT
### (Against Andrew J. Dowd, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT V
### UNJUST ENRICHMENT
### (Against Triborough Orthopedics, P.C. and Andrew J. Dowd, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT VI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Andrew J. Dowd, M.D.)

(a) DECLARE that Andrew J. Dowd, M.D., at all relevant times, engaged in the billing for healthcare services not rendered as represented, engaged in the billing for premature and/or medically unnecessary surgical procedures, engaged in the billing for surgical procedures that were not causally related to the underlying motor vehicle accident, and

submitted charges for surgical procedures and other healthcare services in violation of the applicable Fee Schedule, and thus has no standing to submit or receive assigned No-Fault benefits;

(b) DECLARE that Andrew J. Dowd, M.D.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Andrew J. Dowd, M.D.; and

(d) GRANT all other relief this Court deems just.

### COUNT VII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Triborough Orthopedics, P.C.)

(a) DECLARE that Triborough Orthopedics, P.C., at all relevant times, violated New York Public Health Law § 238-d when it purportedly dispensed medically unnecessary items of durable medical equipment pursuant to improper self-referrals from its sole owner, officer, and shareholder, Andrew J. Dowd, M.D., and submitted excessive charges to Allstate, and thus has no standing to submit or receive assigned benefits under New York's No-Fault Law for durable medical equipment purportedly dispensed pursuant to prescriptions from Andrew J. Dowd, M.D.

(b) DECLARE that Triborough Orthopedics, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Triborough Orthopedics, P.C.; and

(d) GRANT all other relief this Court deems just.

### JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW 7455)
mwhitcher@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
Ph: (347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity*
*Company, Allstate Fire & Casualty Insurance*
*Company, and Allstate Property & Casualty*
*Insurance Company*

Dated: October 10, 2019